UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF FLORIDA
(FORT LAUDERDALE DIVISION)

In re

CASE NO. 05-22912-BKC-RBR
CHAPTER 11

CERTIFIED HR SERVICES COMPANY
f/k/a THE CURA GROUP, INC.,

Debtor.
_____________________________________/

JAMES S. FELTMAN, Chapter 11
Trustee of CERTIFIED HR SERVICES
COMPANY f/k/a THE CURA GROUP, INC.
AND CERTIFIED SERVICES, INC.,

ADV. NO. 07-01316-RBR-A

Plaintiff,
vs.

LEADING EDGE GROUP HOLDINGS,
INC., et al.,

Defendants.
_____________________________________/

**PLAINTIFF'S MOTION TO COMPEL DISCOVERY BASED UPON CRIME-FRAUD EXCEPTION TO THE ATTORNEY-CLIENT PRIVILEGE AND WORK PRODUCT DOCTRINE AND FOR OTHER RELIEF**

The Plaintiff, James S. Feltman, duly appointed and acting Liquidating Trustee of the Certified HR Services Liquidating Trust ("Plaintiff" or the "Trustee"),[1] files this Motion to Compel Discovery against the Defendant, Leading Edge Group Holdings Corporation ("Leading Edge" or the "Defendant"), based upon the Crime-Fraud Exception to the Attorney Client Privilege and the Work Product Doctrine and for Other Relief, and says:

## Introduction

[1] Prior to the confirmation of the plan, the Plaintiff was the duly appointed and acting Chapter 11 Trustee of the Debtor, Certified HR Service Company f/k/a The Cura Group, Inc. ("Cura" or the "Debtor") and its substantively consolidated debtor, Certified Services, Inc. ("CSI"), Cura's corporate parent.

In this action, the Trustee seeks to avoid certain transfers to the Defendant as being fraudulent transfers received from Cura and CSI totaling in excess of $1.9 million. By this motion, the Trustee seeks the entry of an order compelling the Defendant and its respective pre-petition counsel including, but not limited to, attorney Mark Robinson and the law firm of Michelman & Robinson (the "M&R Law"), to disclose the details and substance of *all* communications, documents and accompanying work product relating to transfers, transactions, negotiations and dealings that are the subject matter of this fraudulent transfer action, and which all occurred during the four years prior to Cura filing its bankruptcy petition in 2005.

The determination of the issues raised in this motion will have a significant impact upon this adversary proceeding and the discovery process going forward. At depositions conducted on April 16-18, 2008 in California, Illinois and New Jersey, the deponents, who consisted of: (i) Allen Hilly ("Hilly"), the chairman and CEO of Leading Edge; (ii) Michael Ward, the president/owner of JRSO; and (iii) pre-petition date counsel Leading Edge and JRSO, attorney, Mark Robinson ("Robinson"). Each of the foregoing witnesses failed and refused to answer questions involving the legal facts and circumstances involving a certain non-authorized worker's compensation insurance program provided by Leading Edge to Cura under a purported "term sheet", which program was created, operated, designed and/or implemented by Leading Edge and JRSO, with the active advice and counsel of Robinson and the M&R Law Firm. However, as admitted in, among other evidence, the very "term sheet" governing the rights of the parties, the purported "insurance program" offered by Leading Edge was a sham ***that was not authorized to operate in in any state*** in which it had been implemented and operated by Cura. A copy of the Term Sheet is attached as Exhibit 1 to this motion.

Throughout the depositions taken during April 16-18, 2008, the witnesses repeatedly

asserted that all communications between and among themselves and their counsel relating to the Term Sheet and the resulting transfers and transactions at issue are protected by the attorney-client privilege or the work product doctrine. It is clear that a ruling on this motion at this stage of the proceedings will allow: (i) the discovery process to be streamlined and completed in a timely manner; (ii) for the reduction or elimination of duplicative depositions; and (iii) for this adversary proceeding to proceed expeditiously to trial.

As explained in this motion, all communications and documents relating to the Term Sheet and transfers and transactions at issue are discoverable under the crime-fraud exception because the record evidence establishes a *prima facie* case that the transfers at issue were made with actual intent to hinder or delay Debtor's creditors, and/or were made as part of a bogus non-authorized insurance program that was an outright fraud from inception. In addition, recent events relating to Leading Edge and Hilly further support the application the crime fraud to this case. As explained below, all of Leading Edge's business records have been confiscated by the US government as part of a 2007 $10 million PEO-related wire fraud indictment of Hilly, who is alleged in the criminal action to be the "alter ego" of Leading Edge.

**<u>Facts Supporting the Relief Requested</u>**

***A. The PEO Business***

Prior to the petition date and for a short period of time thereafter, Cura was a Florida corporation that operated as a Professional Employer Organization ("PEO") that provided off-site human resources functions such as payroll administration, employment taxes, benefits, workers compensation and governmental compliance services to various companies. A PEO generally provides services to its clients and its clients' employees, whereby the PEO becomes a co-employer of the clients' worksite employees. Under this arrangement, employment-related liabilities are

contractually allocated between the PEO and the client. Among other responsibilities, the PEO assumes responsibility for and manages the risks associated with workers compensation insurance for worksite employees. As a PEO, Cura maintained workers compensation coverage for employees in all states in which it had employees. A failure by Cura to provide workers compensation coverage could have resulted in severe penalties from state governmental authorities.

### *B. The Individuals and Business Entities Material to this Motion*

CSI, Cura's corporate parent, operated as a public company whose stock was registered with the United States Securities and Exchange Commission. From and after 2001, CSI was controlled by Midwest Merger Management, LLC, a Kentucky limited liability company ("Midwest"), which was described by CSI in its filings with the Securities and Exchange Commission as its principal and controlling shareholder.

Leading Edge is a New Jersey corporation with a principal place of business located at 100 Overlook Center, Second Floor, Princeton, New Jersey 08540. At all times material to this action, Hilly was the President and CEO of Leading Edge.

JRSO is a Missouri corporation with a principal place of business located at 744 Carriage Way, Deerfield. Illinois. At all times material to this action, Michael Ward was the President of JRSO. Through Ward, JRSO introduced Leading Edge and Hilly to Cura.

### *C. The Transfers at Issue*

Between May, 2001and May, 2006, CSI and the Debtor transferred in excess of $108 million to Midwest (collectively, the "Midwest Transfers"). The funds transferred by Midwest to Brentwood came from the Midwest Transfers received from the Debtor and CSI. The Midwest Transfers consisted of the majority, if not all, of the monies generated by CSI and the Debtor in the course of their operations.

In this action, the Trustee alleges that Midwest did not exercise dominion and control over the funds constituting the Midwest Transfers received from CSI and the Debtor and as such acted as conduits for the further transfer of such funds by CSI and the Debtor to others, including the Defendant. Alternatively, the Trustee alleges that Midwest exercised dominion and control over the funds constituting the Midwest Transfers received from the Debtor and/or CSI, determining which third parties, if any, were to be paid and how much they were to be paid.

From the funds constituting the Midwest Transfers, Midwest effectuated transfers to various third parties, including the Defendant, for which neither CSI, the Debtor, nor Midwest, as applicable, received value. Specifically, Leading Edge is alleged to have received the following transfers:

| Check/ Wire Date | Check Number | Payor | Global Payee | Amount |
|---|---|---|---|---|
| 09/16/03 | WIRE | Midwest | Leading Edge Group Holdings (through Michelman & Robinson) | $ 600,000.00 |
| 09/23/03 | WIRE | Midwest | Leading Edge Group Holdings | $ 300,000.00 |
| 10/07/03 | WIRE | Midwest | Leading Edge Group Holdings | $ 343,265.00 |
| 10/24/03 | WIRE | Midwest | Leading Edge Group Holdings | $ 383,000.00 |
| 12/30/03 | 3177 | Midwest | Leading Edge Group Holdings | $ 277,404.00 |
| | | | | $ 1,903,669.00 |

## Legal Argument and Citation to Authority

### I. The Privileges at Issue

#### *A. The Attorney-Client Privilege*

Because this is a federal question case involving federal bankruptcy law (i.e., objection to exemption claims under Fed. R. Bank. P. 4003(b) and 11 U.S.C. § 522 and fraudulent transfers claims under 11 U.S.C. § 544(b)), privilege issues are governed by the federal common law. Fed. R. Evid. 501.

Under federal common law, the attorney-client privilege applies only if:

> (1) the asserted holder of the privilege is or sought to become a client; (2) the person to whom the communication was made (a) is a member of the bar of a court, or his subordinate and (b) in connection with this communication is acting as a lawyer; (3)

> the communication relates to a fact of which the attorney was informed (a) by his client (b) without the presence of strangers (c) for the purpose of securing primarily either (i) an opinion on law or (ii) legal services or (iii) assistance in some legal proceeding, ***and not (d) for the purpose of committing a crime or tort***; and (4) the privilege has been (a) claimed and (b) not waived by the client.

United States v. Jones, 696 F.2d 1069, 1072 (4th Cir. 1982) (emphasis added); see also In re Richard Roe, Inc., 68 F.3d 38, 39-40 (2d Cir. 1995) (quoting United States v. Kovel, 296 F.2d 918, 921 (2d Cir. 1961) (attorney-client privilege applies "(1) [w]here legal advice of any kind is sought (2) from a professional legal adviser in his capacity as such, (3) the communications relating to that purpose, (4) made in confidence (5) by the client, (6) are at his instance permanently protected (7) from disclosure by himself or the legal adviser, (8) except the protection be waived...."). For the privilege to be properly invoked, there must be, *inter alia*, a communication relating to the purpose for which legal advice was sought. 8 Wigmore, Evidence § 2292 at 554 (McNaughton rev. 1961). For the privilege to attach, utterances must be intended to be confidential. United States v. Tellier, 255 F.2d 441, 447 (2d Cir. 1958).

The privilege also extends to communications by the attorney to the client, at least to the extent that they incorporate confidential information previously conveyed by the client. See In re Six Grand Jury Witnesses, 979 F.2d 939, 943-44 (2d Cir. 1992); Bank Brussels Lambert v. Credit Lyonnais (Suisse) S.A., 160 F.R.D. 437, 441-42 (S.D.N.Y. 1995). The burden is on the party asserting the privilege to establish each of the requisite elements. See von Bulow v. von Bulow, 811 F.2d 136, 144 (2d Cir. 1987); Saxholm AS v. Dynal, Inc., 164 F.R.D. 331, 333 (E.D.N.Y. 1996); United States v. Rivera, 837 F.Supp. 565, 567 (S.D.N.Y. 1993); United States v. White, 950 F.2d 426, 430 (7th Cir. 1991). Blanket assertions of the privilege are disfavored. Federal Trade Comm'n v. Shaffner, 626 F.2d 32, 37 (7th Cir. 1980); see also P. & B. Marina, Ltd. Partnership v. Logrande, 136 F.R.D. 50, 54 (E.D.N.Y. 1991) (Weinstein, J.), aff'd, 983 F.2d 1047 (2nd Cir. 1992); In re

Shopping Carts Antitrust Litig., 95 F.R.D. 299, 305 (S.D.N.Y. 1982).

In the instant adversary proceedings, not only has Leading Edge failed to establish that such privileges apply, but all communications and documents relating thereto are discoverable under the crime-fraud exception because, as set forth in detail herein below, the record evidence establishes a *prima facie* case that the transfers at issue were made with actual intent to hinder, delay or defraud the Debtor's creditors.

***B. The Work Product Doctrine***

Rule 26(b)(3) of the Federal Rules of Civil Procedure protects an attorney's work product. N.F.A. Corp. v. Riverview Narrow Fabrics, Inc., 117 F.R.D. 83, 85 (M.D.N.C. 1987); In re Alexander Grant & Co. Litigation, 110 F.R.D. 545, 548 (S.D. Fla. 1986) (Gonzalez, J.). The work product rule applies to items prepared in anticipation of litigation by a party's attorney. In re Alexander Grant, 110 F.R.D. at 548. "[U]pon a proper showing that [items] were prepared ... in anticipation of litigation ... [a party] may invoke the work product privilege." Id.; Duplan Corp. v. Moulinage et Retorderie de Chavanoz, 509 F.2d 730 (4th Cir. 1974); In re Grand Jury Proceedings, Thursday Special Grand Jury Sept. Term, 1991, 33 F.3d 342, 348 (4th Cir. 1994). The analysis of when the privilege protects information from being discoverable depends on whether the work sought is "fact work-product" or "opinion work-product." Id. Fact work-product can be obtained "upon a showing of both substantial need and an inability to secure the substantial equivalent of the materials by alternate means without undue hardship." Id.; see also Hickman v. Taylor, 329 U.S. 495, 67 S.Ct. 385, 91 L.Ed. 451 (1947). Indeed, according to Fed. R. Civ. P. 26(b)(3), work product material that does not involve an attorney's thought process may be ordered produced if the discovering party demonstrates a "substantial need of the materials in preparation of the party's case and that the party is unable without undue hardship to obtain the substantial equivalent of the

materials by other means." The work product doctrine raised in this action is equally overcome by the crime fraud exception.

## II. The Crime-Fraud Exception

### *A. The Attorney-Client Privilege & Work Product Doctrine*

The attorney-client privilege is one of the oldest confidential communication privileges known in the common law and its "purpose is to encourage full and frank communication between attorneys and their clients and thereby promote broader public interests in the observance of law and administration of justice." Upjohn Co. v. United States, 449 U.S. 383, 389, 101 S.Ct. 677, 682, 66 L.Ed.2d 584 (1981). The work product privilege similarly protects activities that are valued under our legal system. Hickman, 329 U.S. at 508, 67 S.Ct. at 392, 91 L.Ed. 451. However, it is well established that an otherwise valid assertion of privilege, either the attorney-client or work product, ***can be overcome by the proper invocation of the crime-fraud exception.*** Cox v. Administrator United States Steel & Carnegie, 17 F.3d 1386, 1422 (11th Cir. 1994), modified, 30 F.3d 1347 (11th Cir. 1994); In re Grand Jury Proceedings, 604 F.2d 798, 803 (3d Cir. 1979). The crime-fraud exception requires the disclosure of otherwise privileged communications or material obtained in the course of the attorney's duties on the client's behalf which are made or performed in furtherance of a crime, fraud, or other misconduct fundamentally inconsistent with the basic premises of the adversary system. See, e.g., Clark v. United States, 289 U.S. 1, 53 S.Ct. 465, 77 L.Ed. 993 (1933); In re Sealed Case, 676 F.2d 793, 812 (D.C. Cir. 1982). "A privilege surviv[es] until the relation is abused and vanish[es] when the abuse is shown to the satisfaction of the judge ...." Clark, 289 U.S. at 16, 53 S.Ct. at 470. The application of this exception is primarily controlled by the client's intent -- it is unnecessary to show that the attorney had actual or constructive knowledge of the crime. United States v. Soudan, 812 F.2d 920, 927 (5th Cir. 1986).

Thus, where an attorney is used in the perpetration of a crime or fraud, there is no basis for allowing the assertion of the privilege. See In re Antitrust Grand Jury, 805 F.2d 155, 164 (6th Cir. 1986). For the fraud exception to apply: (1) a *prima facie* case must be presented that a fraud has occurred; and (2) there must be a connection between the privileged communications at issue and the *prima facie* violation. Antitrust Grand Jury, 805 F.2d at 164; see also Chaudhry v. Gallerizzo, 174 F.3d 394, 403 (4th Cir. 1999) (for crime-fraud exception to apply it must be shown (1) that defendant was engaged in or planning a criminal or fraudulent scheme and used his counsel to further the scheme, and (2) that the privileged information bears a close relationship to the criminal or fraudulent scheme). Notably, while a litigant must make a *prima facie* showing that the communication it seeks falls within the crime-fraud exception, it need not offer absolute proof of fraud or a crime. In re Grand Jury Proceedings, 33 F.3d at 352.

Florida also has adopted the crime-fraud exception. See Fla. Stat. § 90.502(4)(a)(1987) (the attorney-client privilege does not apply where "[t]he services of the lawyer were sought or obtained to enable or aid anyone to commit or plan to commit what the client knew was a crime or fraud."); Florida Mining and Materials Corporation v. Continental Casualty Company, 556 So. 2d 518, 519 (Fla. 2nd DCA 1990) (to come within the crime-fraud exception, a plaintiff "must allege and produce prima facie evidence that [the party asserting the privilege] affirmatively sought the advice of counsel to procure a fraud").

The rationale underlying the attorney-client privilege is not promoted by affording confidentiality to communications between a client and the client's attorney that are in furtherance of an ongoing fraudulent scheme. United States v. Sabbeth, 34 F.Supp. 2d 144, 149 (E.D.N.Y. 1999). As a result, "all Courts agree that the lawyer-client privilege does not extend to [such] communications" which are said to fall within the crime-fraud exception. Weinstein on Evidence,

§ 503.31[1] at 503-91. Notably, neither the failure of the scheme, In re Grand Jury Subpoena Duces Tecum, 731 F.2d 1032, 1039 (2d Cir. 1984), nor the fact that the attorney may have been oblivious to the significance of the communication made by the client is not controlling. United States v. Ballard, 779 F.2d 287, 292 (5th Cir. 1986). Rather, if a party intentionally provides information to his or her attorney which would otherwise be privileged, but with the intent that the communication itself would serve to advance an ongoing fraudulent scheme, then the communication is not shielded from disclosure. Sabbeth, 34 F. Supp. 2d at 150. Although there is a societal interest in enabling clients to get sound legal advice and representation, there is no such interest when the communications with the attorney are intended to further a crime or fraud. Thus, the crime-fraud exception to the attorney-client privilege and the work-product doctrine is designed to insure that the privileges do not extend to communications or work-product that further the commission of a fraud or crime. United States v. Zolin, 491 U.S. 554, 563, 109 S.Ct. 2619, 2626 105 L.Ed.2d 469 (1989).

To establish the applicability of the crime-fraud exception it "must [be] demonstrate[d] that there is a factual basis for a showing of probable cause to believe that a fraud or crime has been committed and that the communications in question were in furtherance of the fraud or crime." United States v. Jacobs, 117 F.3d 82, 87 (2d Cir. 1997). The crime-fraud exception strips the attorney-client privilege from any communications that "relate to client communications in furtherance of contemplated or ongoing criminal or fraudulent conduct." In re John Doe, Inc., 13 F.3d 633, 636 (2d Cir. 1994) (quoting In re Grand Jury Subpoena Duces Tecum Dated September 15, 1983, 731 F.2d 1032, 1038 (2d Cir. 1984)). The purpose of the exception is "to assure that the 'seal of secrecy' between lawyer and client does not extend to communications 'made for the purpose of getting advice for the commission of a fraud' or crime." Jacobs, 117 F.3d at 87 (quoting

Zolin, 491 U.S. at 563, 109 S.Ct. at 2619) (internal citations omitted).

The burden is on the party invoking the crime-fraud exception to "demonstrate that there is a factual basis for a showing of probable cause to believe that a fraud or crime has been committed and that the communications in question were in furtherance of the fraud or crime." Id. In evaluating the basis presented, a court follows a two-step process. First, it considers whether a "prudent person" would find that the evidence proffered would constitute "a reasonable basis to suspect the perpetration or attempted perpetration of a crime or fraud, and that the communications were in furtherance thereof." Id. (quoting In re Grand Jury Subpoena Duces Tecum, 731 F.2d at 1039). Then, the court may decide to review the evidence *in camera*. Zolin, 491 U.S. at 572, 109 S.Ct. at 2619; Jacobs, 117 F.3d at 87.

Certain courts have defined the exception to encompass communications in furtherance of a "tort," Horizon of Hope Ministry v. Clark County, Ohio, 115 F.R.D. 1, 5 (S.D. Ohio 1986); a "crime or tort," United States v. United Shoe Machinery Corp., 89 F.Supp. 357, 358 (D. Mass. 1950); People v. Belge, 59 A.D.2d 307, 309, 399 N.Y.S.2d 539, 540 (4th App. Dep't 1977), a "crime, fraud, or other type of misconduct fundamentally inconsistent with the basic premises of the adversary system," Coleman v. American Broadcasting Cos., 106 F.R.D. 201, 208 (D.D.C. 1985) (quoting In re Sealed Case, 676 F.2d at 812 (D.C. Cir. 1982)), or "intentional torts moored in fraud." Sackman v. Liggett Group, Inc., 173 F.R.D. 358, 364 (E.D.N.Y. 1997) (quoting Cooksey v. Hilton International Co., 863 F.Supp. 150, 151 (S.D.N.Y. 1994)). Others have construed the exception as reaching some conduct beyond crime and fraud. See Sackman, 173 F.R.D. at 364; Cooksey, 863 F.Supp. at 151; Rattner v. Netburn, No. 88 Civ. 2080, 1989 WL 223059, at *47 (S.D.N.Y. June 20, 1989) (intentional torts); In re Heuwetter, 584 F.Supp. 119, 127 (S.D.N.Y. 1984) (torts); Irving Trust Co. v. Gomez, 100 F.R.D. 273, 276 (S.D.N.Y. 1983) ("intentional or reckless tortious

behavior"); Diamond v. Stratton, 95 F.R.D. 503, 505 (S.D.N.Y. 1982) (intentional tort).

Bankruptcy courts have likewise applied and recognized the crime-fraud exception to the attorney-client privilege. See In re Andrews, 186 B.R. 219 (Bankr. E.D. Va. 1995); In re Rigby, 199 B.R. 358 (Bankr. E.D. Tex. 1995); In re Diamont v. Sheldon L. Pollack Corporation, 216 B.R. 589 (Bankr. S.D. Tex.1995); and In re Cumberland Investment Corporation, 120 B.R. 627 (Bankr. D. R.I.. 1990). ***In fact, the exception has been held to apply to claims seeking to avoid fraudulent transfers made with actual intent to hinder, delay or defraud creditors.*** See In re Southern Textile Knitters, Inc., 1999 WL 33485637 (Bankr. D.S.C. Aug. 2, 1999). As noted in Southern Textile:

> In order to circumvent the attorney/client privilege on the basis of fraud, the Trustee must make a *prima facie* case by demonstrating one or more "badges of fraud" is present. In the current case, there are several such badges. There is an insider relationship between the debtor. Mr. Simchon, and Southern Textile Knitters of Greenwood, Inc. Mr. Simchon owns all the stock and is the president of Southern Textile Knitters of Greenwood, Inc. Mr. Simchon and several other members of his family own all the stock of the debtor and Mr. Simchon was the president of the debtor. The transfer of the inventory took place no more than three months prior to the filing of the involuntary petition. Close proximity in time to insolvency and litigation are both recognized badges of fraud. The nature of the transaction has been secreted by Mr. Simchon. At his Bankruptcy Rule 2004 examination, he indicated that the transfer of inventory was a contemporaneous exchange. However, the canceled check and the invoices submitted by the Trustee indicate that the transaction was not contemporaneous. The debtor continued to have possession of the transferred inventory after the alleged transaction had taken place. Finally, the defendant, STK Greenwood took over the debtor's location, customers, employees, and telephone number. ***It is not necessary that the Trustee prove intent to defraud at this time. However, the Trustee has established a prima facie case by demonstrating one or more badges of fraud.***

Id. (emphasis added).

Thus, in the bankruptcy setting, it has been held that the attorney-client privilege will not protect communications relating to a Debtor, when such communications involved fraudulent transfers and, therefore, fall within the crime-fraud exception to the attorney-client privilege. In order to invoke the crime-fraud exception, the trustee must make a *prime facie* case by

demonstrating one or more "badges of fraud is present." Southern Textile; In re Andrews, 186 B.R. 219 (Bankr. E.D. Va. 1995).[2]

Likewise, if the Trustee's burden is sustained, not only are attorney-client privileged communications discoverable, but also any information claimed as privileged under the work product doctrine. See Richard Roe, 68 F.3d at 40 (the crime-fraud exception applies to the work product doctrine just as it does to the attorney-client privilege); In re Grand Jury Proceedings, 33 F.3d at 347. See In re Grand Jury Proceedings, 102 F.3d 748, 750-51 (4th Cir. 1996) ("The attorney-client *and work-product privileges* are lost ... when a client gives information to the attorneys for the purpose of committing or further a crime or fraud.") (emphasis added).

Under Eleventh Circuit law, a two-part test is employed to determine whether the crime-fraud exception applies:

> First, there must be a prima facie showing that the client was engaged in criminal or fraudulent conduct when he sought the advice of counsel, that he was planning such conduct when he sought the advice of counsel, or that he committed a crime or fraud subsequent to receiving the benefit of counsel's advice. Second, there must be a showing that the attorney's assistance was obtained in furtherance of the criminal or fraudulent activity or was closely related to it.

In re Grand Jury Investigation (Schroeder), 842 F.2d 1223, 1226 (11th Cir. 1987); see also Cox, 17 F.3d at 1416. "The first prong is satisfied by a showing of evidence that, if believed by a trier of fact, would establish the elements of some violation that was ongoing or about to be committed." Schroeder, 842 F.2d at 1226. Such a showing must have a foundation in fact, and cannot rest upon mere allegation. Id. When determining the second prong, the requirement that the legal advice be

---

[2] According to the Andrews court, these badges of fraud include: (1) a relationship between the debtor and the transferee; (2) lack of consideration for the conveyance; (3) Debtor's insolvency or indebtedness; (4) transfer of debtor's entire estate; (5) reservation of benefits, control, or dominion by the debtor; (6) secrecy or concealment of the transaction; and (7) pendency or threat of litigation at the time of transfer. Andrews, 186 B.R. at 222. Notably, these "badges of fraud" are similar to the eleven badges identified under Chapter 726 of the Florida Statutes.

in furtherance or related to fraudulent conduct "should not be interpreted restrictively." Id. at 1227.

The party opposing the privilege on the crime-fraud exception has the initial burden of producing evidence which, if unexplained, would be *prima facie* proof of the existence of the exception. The burden of persuasion then shifts to the party asserting the privilege to give a reasonable explanation of its conduct. If the court accepts the explanation as sufficient to rebut the evidence presented by the party opposing the privilege, then the privilege remains. If the court does not find the evidence is sufficient to rebut the *prima facie* case, then the *prima facie* case still exists and the privilege is lost. See Matter of Feldberg, 862 F.2d 622, 626 (7th Cir. 1988) (finding that after *prima facie* showing that exception applies, party asserting privilege should have opportunity to rebut; "[i]f the court finds the explanation satisfactory, the privilege remains"). In order to carry its burden of persuasion, the party seeking to invoke the privilege has to demonstrate by a preponderance of the evidence that the *prima facie* showing that the crime-fraud exception applies should not be accepted. This is consistent with the general rule that the burden of proof to establish the existence of the attorney-client privilege rests on the party who claims the privilege. See In re Grand Jury Investigation (Schroeder), 842 F.2d at 1225.

Based upon the record evidence to date, it is clear that a *prima facie* case has been established that the transfers at issue were done with actual intent to hinder, delay or defraud the Debtor's creditors. As such, the crime-fraud exception applies requiring the disclosure of documents and communication previously withheld under the attorney-client privilege.

### ***B. The Badges of Fraud***

The Eleventh Circuit has recognized that direct proof of actual fraud is often very difficult to establish. See, e.g., Dionne v. Keating (In re XYZ Options, Inc.), 154 F.3d 1262, 1271 (11th Cir. 1998). Recognizing that direct evidence of fraud does not always exist, courts also allow fraudulent

intent to be proven through circumstantial evidence and the surrounding circumstances of the transactions, including the "badges of fraud." Id. at 1271-72. These badges include:

(1) The transfer was to an insider;

(2) The debtor retained possession or control of the property transferred after the transfer;

(3) The transfer was disclosed or concealed;

(4) Before the transfer was made the debtor had been sued or threatened with suit;

(5) The transfer was of substantially all of the debtor's assets;

(6) The debtor absconded;

(7) The debtor removed or concealed assets;

(8) The value of the consideration received by the debtor was not reasonably equivalent to the value of the asset transferred;

(9) The debtor was insolvent or became insolvent shortly after the transfer was made;

(10) The transfer occurred shortly before or shortly after a substantial debt was incurred; and

(11) The debtor transferred the essential assets of the business to a lienor who transferred the assets to an insider of the debtor.

Id.

In addition, the first indication that a debtor is experiencing financial difficulties is a delay in paying his normal creditors and vendors as their debts come due. A dishonest debtor, seeing financial trouble on the horizon as reflected in his inability to pay normal and ordinary debts as they come due, may begin to make fraudulent conveyances. Thus, a twelfth badge of fraud to be considered in determining the intent of a debtor is whether the debtor is paying his normal and

ordinary debts as they come due when the alleged fraudulent conveyances occur. In re Model Imperial, Inc., 250 B.R. 776 (Bankr. S.D. Fla. 2000) (Hyman, J.).

The Eleventh Circuit found that when using the badges of fraud to determine the existence of actual fraudulent intent, courts should consider the totality of the circumstances. Citing In re Sherman, 67 F.3d 1348 (8th Cir. 1995), the court in XYZ Options stated that "[a]lthough the presence of one specific 'badge' will not be sufficient to establish fraudulent intent, the 'confluence of several can constitute conclusive evidence of an actual intent to defraud.'" XYZ Options, 154 F.3d at 1271 n.17; see also General Trading Inc. v. Yale Materials Handling Corp., 119 F.3d 1485, 1498 (11th Cir. 1997); Harman v. First American Bank of Maryland (In re Jeffrey Bigelow Design Group, Inc.), 956 F.2d 479, 483-84 (4th Cir. 1992) ("While each fact does not have to demonstrate actual fraud, the facts taken together must lead to the conclusion that actual fraud existed"); In re Young, 235 B.R. 666, 669 (Bankr. M.D. Fla. 1999) ("While a single badge of fraud may create a suspicion but not the requisite fraud to set aside a conveyance, several considered together may afford a basis to infer fraud").

According to the Fourth Circuit, a determination of actual fraudulent intent must include a "subjective evaluation of the debtor's motive." Harman, 956 F.2d at 484 (discussing also that "an objective determination has bearing on whether constructive fraudulent intent exists, but is not conclusive for actual fraudulent intent"); see also Thompson v. Jonovich (In re Food & Fibre Protection, Ltd.), 168 B.R. 408, 418 (Bankr. D. Ariz. 1994) (stating that § 548(a)(1) sets out a subjective test for actual fraudulent intent).

Applying the badges of fraud to the record evidence of the instant adversary proceeding overwhelmingly establishes a *prima facie* case that the transfers at issue were done with actual intent to hinder, delay or defraud Debtor's creditors because at least seven of the twelve badges exist:

(1) The transfer was to an insider:

The initial transfers were made to Midwest, Cura's controlling shareholder, which then transferred the funds to the Defendant.

(4) Before the transfers were made the Debtor had been sued or threatened with suit:

Several material lawsuits were pending against Cura at or around the time of the transfers at issue.

(5) The transfers were of substantially all of the Debtor's assets:

The Midwest Transfers comprised substantially all of the Debtor's assets.

(7) The Debtor was not paying its normal and ordinary debts as they became due when the fraudulent transfers occurred:

Significant liabilities went unpaid at or around the time of each of the Midwest Transfers, and at the time of the transfers to the Defendant at issue.

Because the record evidence to date establishes a *prima facie* case that the transfers at issue were done with actual intent to hinder or delay the Debtor's creditors the crime-fraud exception applies preventing the application of the attorney-client privilege and work-product doctrine. The record evidence further establishes that the Defendant consulted with and retained counsel in regard to the preparation of the Term Sheet, which resulted in the transfers at issue. As such, the Defendant should be compelled to disclose all documents and communications between itself and its counsel relating to the transfers at issue.

***C. The Fraudulent Nature of the Terms and Conditions of the Term Sheet***

In addition, the language of the Term Sheet itself attached as Exhibit 1 to this motion likewise establishes the fraudulent nature of the transfers and transactions at issue. The Term Sheet provided as follows:

PLEASE BE ADVISED THAT THE SECURITIZER [as defined in the Term Sheet] IS NOT LICENSED BY ANY GOVERNING BODY AS AN INSURANCE OR REINSURANCE COMPANY. THE SECURITIZATION PROGRAM IS NEITHER INTENDED NOR IS QUALIFIED UNDER ANY JURISDICTION AS AN ACCEPTABLE OR AS AN ALTERNATIVE TO ANY COMPULSORY INSURANCE IN ANY STATE IN THE USA, AND HAS NOT BEEN APPROVED BY ANY GOVERNMENTAL AGENCY AS A VIABLE VEHICLE TO PROVIDE STATE REQUIRED WORKERS' COMPENSATION INSURANCE. ALL PARTIES RECOGNIZE THAT THE TERM WORKERS' COMPENSATION HAS SPECIFIC MEANING AND INTENT AS ADOPTED BY ALL JURISDICTION OF THE USA, AND AS SUCH THE ASSOCIATED PROGRAM MAY ONLY BE ENTITLED AS AN "EMPLOYERS OCCUPATIONAL MEDICAL AND INDEMNITY PROGRAM". CURA and SECURITIZER (as hereinafter defined) collectively believe that the provisions of the Employers Occupational Medical and Indemnity Program set forth below are an acceptable alternative vehicle to traditional workers' compensation coverage as either afforded by an admitted and properly certified insurance company, or a State sponsored pool. Should any State authority issue a final determination, after due consideration of the arguments proffered by CURA and/or LEADING EDGE HOLDINGS, CURA shall have the option to replace the Employers' Occupational Medical and Indemnity Program in that State with an alternative program or LEADING EDGE HOLDINGS shall have the option of terminating the Employers' Occupational Medical and Indemnity Program in that State or in all States.

* * *

LEADING EDGE HOLDINGS via a Special Purpose Reinsurer ("SPR"), collectively hereinafter referred to as "SECURITIZER" shall provide SECURITIZATION to CURA and its specific customers effective June 30, 2003 and continuing through June 29, 2004, hereinafter referred to as the "INITIAL ANNUAL PERIOD," renewable minimum of SIXTY (60) days in advance of each subsequent annual period, but exclusively at the discretion of the SECURITIZER. The SPR shall fully SECURITIZE the Employers Occupational Medical and Indemnity Program to include such claims, losses, and liability of CURA's and the specifically recognized and identified CURA clients, but specifically excluding all operations within the States of Arizona, Florida and Nevada. As described herein, the nature of the transaction necessitates the introduction of an offshore SPR for the sole purpose of facilitating the process, and as such CURA and its clients are required in remitting the requisite Federal Excise Tax ("FET") presently calculated at three percent (3%) of the prepaid paid-in-capital, subject to a monthly audit in determining the actual accrued/assumed paid-in-capital. Typically, SECURITIZATION includes and/or involves top line related fees, expenses and loading variables payable to SECURITIZER in advance and at future intervals as a percentage of the cost of such transaction. In this relationship, SECURITIZER hereby entirely waives all such SECURITIZAT1ON top line driven income in exchange for complete ownership of the accrued paid-in-capital, and as such, completely and exclusively realizes or

> inherits, respectively, the upside or downside potential associated with SECURITIZING the transaction as described herein.

Term Sheet at pp. 1-2.

The above quoted provisions of the Term Sheet are bizarre, at best. At worst, they evidence a scheme by and among the Defendant, JRSO, and their counsel to hinder, delay or defraud the clients of Cura by leading them to believe that valid worker's compensation insurance was being provided when, in fact, no such valid or authorized product was in place. Indeed, as quoted above the very document executed by the parties expressly admits that the securitization program "has ***not*** been approved by any governmental agency as a viable vehicle to provide state required workers' compensation insurance." [emphasis added]. Equally troubling is the reference in the Term Sheet to an "offshore" entity to act as a "Special Purpose Reinsurer" (the "SPR") for under the agreement between the parties. Notably, as testified to by Hilly at his deposition, Leading Edge ended up suing the very SPR contemplated under the Term Sheet, and obtained a uncollectible judgment against it. The SPR referenced in the Term Sheet that was sued by Leading Edge was incorporated in the Cayman Islands, an internationally infamous off shore locale.

As noted above, PEO's such as Cura are required to maintain workers compensation coverage for employees in all states in which they have employees. The insurance coverage provided must comply with the laws, guidelines and policies established by the various state statutory insurance regulations. The Term Sheet unequivocally fails on its face to provide such insurance coverage. It is beyond dispute that the failure of a PEO such as Cura to provide state-authorized workers compensation coverage could resulted in severe penalties from state governmental authorities, including the imposition of fines and penalties and the issuance of a determination that no further business could be conducted in a particular state. These legal concerns are separate and apart from the serious problem of potentially misleading clients of Cura as to

whether in fact they truly had valid, worker's compensation coverage in place while paying substantial sums to Cura in regard to the purported PEO related services it claimed to be providing. Moreover, the use of an off shore business entity additionally compounds the significant and serious questions, concerns and issues raised by the terms and conditions of the Term Sheet itself.

### *D. The Hilly Indictment*

When asked about Leading Edge's business operations at his deposition conducted last week, Hilly took the Fifth Amendment as to one question, and gave several evasive, non-responsive "I do not recall" answers to other basic questions, such as who at Leading Edge assisted him in performing under the Term Sheet with Cura. Notably, on January 12, 2007, Hilly was indicted in New Jersey federal court on 231 counts of wire fraud based upon over $10 million of employee trust fund/withholding taxes wrongfully diverted from various PEOs to the defendant in this action, Leading Edge. A copy of the Hilly indictment is attached as Exhibit 2 to this motion. The indictment stemmed from a Criminal Complaint filed against Hilly on December 12, 2006, a copy of which is attached as Exhibit 3 to this motion. In Attachment "B" to the Criminal Complaint FBI special agent Patrick J. Moran attested under oath that:

> Leading Edge Holdings Corporation [the defendant in this action] was formed on January 1, 2001; that no shares of Leading Edge Holdings Corporation stock had ever been issued; that its sole capital had been contributed by [Hilly]; that [Hilly] was the exclusive shareholder of the company; and that no one else was involved in the company. In other words, Leading Edge Holdings Corporation is a shell company that is the alter ego for Allen Hilly.

At his deposition taken in New Jersey last week Hilly testified that all of the business records of Leading Edge have been confiscated as a result of the indictment, and that leading Edge has ceased all further business operations. In an article entitled REGULATION OF EMPLOYEE LEASING COMPANIES TO PREVENT INSURANCE AND TAX ABUSES, attorney Lynn E. Szymoniak, Esq. reported the Hilly indictment as an example of rampant fraud and abuses in the

PEO business and added that "Hilly has also been accused by state insurance regulators of selling workers' compensation insurance which he was not authorized to sell." A copy of the Szymoniak article is attached as Exhibit 4 to this motion.[3]

Although the allegations in the Hilly indictment arise out of bank transfers made in 2006 (while the transfers at issue in this action occurred in 2003), the serious questions raised by the Term Sheet itself, along with equally troubling allegations of the misuse of PEO funds by Hilly and his "alter ego" company, Leading Edge, lend substantial additional support to the Trustee's contention that the crime-fraud exception requires the discovery of all attorney client privileged communications and work product information relating to the Term Sheet and transfers at issue in this case.

## III. The Privilege Objections Raised Were Not Supported by any Foundation

The Trustee objects to the instructions not to answer and the refusals to answer based upon the failure of any of the witness to establish the applicability of the attorney client privilege and work product doctrine to each question asked. As explained above, the attorney client privilege only relates to communications arising out of advice given by counsel, and not to other communications unrelated to providing legal advice. No foundation was made at the depositions to establish that the rendering of advice was at issue, nor were any other elements of the attorney client privilege established. As such, all attorney time/billing records, conflict waiver letters, and all other

---

[3] Interestingly, the Szymoniak article references the Cura/CNA multi-million dollar letter of credit fraud as a further example of rampant fraud and abuses in the PEO business:

> [O]n December 15, 2006, Jose David Kaufman entered into a plea agreement relating to a criminal information filed against him. Kaufman was originally indicted on August 16, 2005, and charged with providing fraudulent letters of credit for $47.5 million to two employee leasing companies, Certified Services and The Cura Group, as collateral for workers' compensation insurance policies issued by CNA. Sentencing for Kaufman was set for March 7, 2007. Two defendants, Otha Ray McCartha and Charles Spinelli, were indicted with Kaufman. Trial for McCartha and Spinelli was set for March 19, 2007.

documents and communications that are not otherwise providing or disclosing legal advice must be produced. Likewise, each of the deponents failed to establish any basis to claim the work product privilege because, among other deficiencies, no proffer was made that any of the information and documents being withheld are or were the subject of being made or created in anticipation of litigation.

## IV. No Privilege Log Was Produced

Finally, the Defendant should be compelled to produce a privilege log and to make all withheld documents available for an in camera inspection. The request for production served on the Defendant required a privilege log to be served. To date, no such log has been produced.

## Conclusion

For the reasons stated above, this motion should be granted and the Defendant compelled to disclose all documents and communications between and among the Defendant and its counsel relating to the transfers and transactions at issue.

WHEREFORE, the Trustee demands the relief requested herein and any other relief the Court deems appropriate.

Respectfully submitted this 24th day of April, 2008.

**I hereby certify that I am admitted to the United States District Court for the Southern District of Florida and I am in compliance with the additional qualifications to practice in this Court set forth in Local Rule 2090-1(A).**

GENOVESE JOBLOVE & BATTISTA, P.A.
Attorneys for the Trustee
Bank of America Tower
100 S.E. Second Street, Suite 3600
Miami, Florida 33131
Tel.: (305) 349-2300
Fax.: (305) 349-2310

By:/s/David C. Cimo
David C. Cimo, Esq. #775400

**CERTIFICATE OF SERVICE**

I HEREBY CERTIFY that a true and correct copy of the foregoing was served via CM/ECF, facsimile and/or U.S. Mail to all parties listed below this 24th day of April, 2008.

/s/David C. Cimo
David C. Cimo

Andrew M. Schwartz, Esq.
Andrew M. Schwartz, P.A.
101 Plaza Real South, Suite 218
Boca Raton, Florida 33432
(Attorneys for Leading Edge and JRSO)

Steven V. Falanga, Esq.
Connell Foley LLP
85 Livingstone Avenue
Roseland, New Jersey 07068
(Attorneys for Leading Edge and JRSO)

David P. Hartnett, Esq.
Hinshaw & Culbertson
9155 South Dadeland Boulevard, Suite 1600
Miami, Florida 33156
(Attorneys for Michelman & Robinson)

# TERM SHEET

## EMPLOYERS' OCCUPATIONAL MEDICAL AND INDEMNITY SECURITIZATION PROGRAM

The following shall serve as a binding Term Sheet between JRSO, Inc. ("JRSO"), LEADING EDGE GROUP HOLDINGS CORPORATION ("LEADING EDGE HOLDINGS"), and THE CURA GROUP, INC. and its related companies (hereinafter collectively referred to as "CURA"). Please be advised, that this Term Sheet shall be non-binding until such time as it is fully executed by all parties. Within a reasonable time subsequent to execution of this Term Sheet, the parties agree to enter into a formal written agreement setting forth the terms herein in full. In this relationship, the role of JRSO encompasses brokering and management services on behalf of LEADING EDGE HOLDINGS and CURA and under no circumstance shall the parties' construe such function as having the authority of binding either organization without prior written approval of LEADING EDGE HOLDINGS and/or CURA. PLEASE BE ADVISED THAT THE SECURITIZER IS NOT LICENSED BY ANY GOVERNING BODY AS AN INSURANCE OR REINSURANCE COMPANY. THE SECURITIZATION PROGRAM IS NEITHER INTENDED NOR IS QUALIFIED UNDER ANY JURISDICTION AS AN ACCEPTABLE OR AS AN ALTERNATIVE TO ANY COMPULSORY INSURANCE IN ANY STATE IN THE USA, AND HAS NOT BEEN APPROVED BY ANY GOVERNMENTAL AGENCY AS A VIABLE VEHICLE TO PROVIDE STATE REQUIRED WORKERS' COMPENSATION INSURANCE. ALL PARTIES RECOGNIZE THAT THE TERM WORKERS' COMPENSATION HAS SPECIFIC MEANING AND INTENT AS ADOPTED BY ALL JURISDICTION OF THE USA, AND AS SUCH THE ASSOCIATED PROGRAM MAY ONLY BE ENTITLED AS AN "<u>EMPLOYERS OCCUPATIONAL MEDICAL AND INDEMNITY PROGRAM</u>". CURA and SECURITIZER (as hereinafter defined) collectively believe that the provisions of the Employers Occupational Medical and Indemnity Program set forth below are an acceptable alternative vehicle to traditional workers' compensation coverage as either afforded by an admitted and properly certified insurance company, or a State sponsored pool. Should any State authority issue a final determination, after due consideration of the arguments proffered by CURA and/or LEADING EDGE HOLDINGS, CURA shall have the option to replace the Employers' Occupational Medical and Indemnity Program in that State with an alternative program or LEADING EDGE HOLDINGS shall have the option of terminating the Employers' Occupational Medical and Indemnity Program in that State or in all States. Additionally, CURA's duty to make payments to LEADING EDGE HOLDINGS based upon wages paid in those States where the program has been replaced shall terminate and SECURITIZATION for all such newly received claims shall simultaneously cease. However, CURA shall be responsible for all outstanding and audited payments, fees, and costs due LEADING EDGE HOLDINGS as well as JRSO and LEADING EDGE HOLDINGS shall be responsible in returning any advanced sum (paid-in-capital and/or FET) that is not duly accrued.

EXHIBIT
tabbies
1

**General:** LEADING EDGE HOLDINGS via a Special Purpose Reinsurer ("SPR"), collectively hereinafter referred to as "SECURITIZER" shall provide SECURITIZATION to CURA and its specific customers effective June 30, 2003 and continuing through June 29, 2004, hereinafter referred to as the "INITIAL ANNUAL PERIOD," renewable minimum of SIXTY (60) days in advance of each subsequent annual period, but exclusively at the discretion of the SECURITIZER. The SPR shall fully SECURITIZE the Employers Occupational Medical and Indemnity Program to include such claims, losses, and liability of CURA's and the specifically recognized and identified CURA clients, but specifically excluding all operations within the States of Arizona, Florida and Nevada. As described herein, the nature of the transaction necessitates the introduction of an offshore SPR for the sole purpose of facilitating the process, and as such CURA and its clients are required in remitting the requisite Federal Excise Tax ("FET") presently calculated at three percent (3%) of the prepaid paid-in-capital, subject to a monthly audit in determining the actual accrued/assumed paid-in-capital. Typically, SECURITIZATION includes and/or involves top line related fees, expenses and loading variables payable to SECURITIZER in advance and at future intervals as a percentage of the cost of such transaction. In this relationship, SECURITIZER hereby entirely waives all such SECURITIZATION top line driven income in exchange for complete ownership of the accrued paid-in-capital, and as such, completely and exclusively realizes or inherits, respectively, the upside or downside potential associated with SECURITIZING the transaction as described herein The SECURITIZER and CURA shall have the right to terminate this agreement for "cause" upon sixty (60) days written notice. "Cause" shall be defined as: (1) a material breach of any provision of this agreement; (2) any act of gross negligence or dishonesty; and/or any material misrepresentations or omission concerning this agreement. Notice of termination shall be in writing and shall be deemed duly delivered upon being deposited as Certified Mail, Return Receipt Requested with the United States Postal Service, bearing the party's address as follows:

The Cura Group, Inc., Attention Dan Pixler, 5101 NW 21st Avenue, Suite 350, Fort Lauderdale, Florida 33309, with a copy via regular mail to The Cura Group, Inc., Attention Judd Wagenseller Esquire, Corporate Counsel, 10602 Timberwood Circle # 9, Louisville, Ky 40223

Leading Edge Group Holdings Corporation/JRSO, Inc., c/o Mark Robinson, Esquire, Michelman & Robinson, LLP, 15760 Ventura Boulevard, Suite 500, Encino, California 91436 with a copy via regular mail to Attention Allen Hilly, Leading Edge Group Holdings Corporation, 100 Overlook Center, Second Floor, Princeton, New Jersey 08003, with a copy via regular mail to Attention Michael A. Ward, JRSO, Inc, 744 Carriage Way, Deerfield, Illinois, 60015.

In the event of a cancellation or at the end of the INITIAL ANNUAL PERIOD and each consecutive annual period, a physical audit shall be conducted of CURA records. Within ten (10) days of the completion of the audit, payment of any additional funds due and owing as a result of the audit shall be paid.

**Claims:** Claims will be administrated, adjusted, and paid through third party claims administrator, INNOVATIVE RISK MANAGEMENT, INC. ("INNOVATIVE"), located in Tyler Texas. SECURITIZER shall enter into an agreement with Innovative to coincide with the period covered by this agreement and associated conditions as outlined in this Agreement within a reasonable time after execution of this document. SECURITIZER shall provide CURA with a copy of that agreement immediately upon its execution. In general, there shall be no claim limit above which SECURITIZER's obligation to pay claims ceases. However, due to the unknown/undocumented retroactive emphasis of SECURITIZING the period commencing June 30, 2003 and through the actual specific date in which this agreement is executed, SECURITIZER shall for only this specified period satisfy each incurred or otherwise claim ultimately equating to one hundred thousand ($100,000.00) dollars or less. Immediately upon INNOVATIVE assigning specific value to the portfolio for period commencing June 30, 2003 through the actual date the agreement is executed, including potential fines and/or penalties to be levied arising from late payments, etc., SECURITIZER, at it sole discretion, may completely eliminate the threshold and/or simply identify each specific claim requiring CURA participation. If SECURITIZER does not choose to eliminate the threshold, the parties agree that the rate due from CURA for payroll subject to the threshold, shall be calculated at 80% of the rate that would have been charged had there been no threshold. In such case, for the period June 30, 2003 through the date the agreement is executed, CURA shall be entitled to a credit, in the amount of 20% of the rate that would have been due had there been no threshold. Such credit shall be applied as a deduction from the next regularly scheduled payment.

**Rates:** The valuation of the SECURITIZED PORTFOLIO is entirely proprietary to the SECURITIZER, is subject to specific pricing consideration and agreement between the parties, although it utilizes some basic rating schematics germane to payroll related variables. The rates to be applied to payroll are based on year 2001, as promulgated by the NCCI or the other respective state rating bureaus, and do not include loss cost modifiers, and are more particularly set forth in a document attached hereto and made part hereof and referred to as Exhibit A.

**Reporting:** CURA shall provide JRSO and SECURITIZER with weekly reports of gross wages of CURA and the specifically recognized and identified

customers. CURA may not under any circumstance accept any additional not specifically recognized and identified customer without prior written approval of SECURITIZER. CURA and its customer records shall be subject to audit by JRSO and/or LEADING EDGE, upon three (3) days notice.

Financial: **The monthly Paid-in-Capital due from CURA, on the fifteenth (15th) business day of each month preceding the actual month of activity to be SECURITIZED, subject to an actual monthly audit must include that associated/calculated FET, is estimated to be three hundred and eighty-three thousand dollars or ($383,000.00), and based on current payroll.** In accordance with the role and associated services to be afforded by JRSO as described herein, as a function of accrued paid-in-capital, presently calculated as ten percent (10%) of accrued paid-in-capital, SECURITIZER concurrent with each paid-in-capital sum, shall bear the exclusive responsibility in calculating and remitting to JRSO such amount. The total amount currently estimated due by CURA for the period of June 30, 2003 through October 31, 2003 is one million two hundred and thirty-two thousand, seven hundred and eighty-four dollars ($1,232,784.00), which is calculated as follows: June 30 through July 31: $383,000.00; August 1, through August 31: $383,000.00; September 1 through September 30; $383,000.00; October 1 through October 31; $383,000.00, PLUS FET of three percent (3%) or $45,960.00 equates to $1,577,960.00, LESS, total paid-in-capital by CURA of $345,176.00. Simultaneous with execution of this document, CURA shall wire transfer the sum of six hundred thousand dollars ($600,000.00) to Michelman & Robinson, LLP Client Trust Account. In addition, the parties acknowledge that Michelman & Robinson, LLP is accepting the initial payment in this matter as an accommodation and is not a fiduciary or agent of CURA. On or before September 15, 2003, CURA shall wire transfer the sum of three hundred thousand dollars ($300,000.00) to Leading Edge's commercial bank account and on or before September 22, 2003, CURA shall wire transfer the sum of three hundred and thirty-two thousand, seven hundred and eighty-four dollars ($332,784.00) to Leading Edge's commercial banking account. **The actual total amount due for the period covered by the above payments shall be determined within 60 days of the date the funds are remitted, and any shortfall or overpayment shall be adjusted as an addition (in the case of a shortfall) or deduction (in the case of an overpayment) to the next regularly scheduled payment due from CURA.**

Release: As a condition precedent to the validity of this Term Sheet, the parties agree to enter into a mutual unconditional release and waiver of any known or unknown claims, including but not limited to all communications, dialogues, e-mails, correspondence, representations, warranties, claims, damages, liability, costs, attorneys' fees concerning this program and any

business dealings between the parties retroactively and through the date of this Term Sheet.

**Legal:** Venue for any litigation concerning this agreement shall be with the State or Federal courts in Princeton, New Jersey. Additionally, New Jersey law shall be applicable. CURA shall indemnify and hold harmless JRSO and the SECURITIZER from and against all claims, damages, law suits, including reasonable attorneys' fees and costs, concerning any matters contained in this Term Sheet, any third parties claims as a result of CURA's or it's customers performance or failure to perform, and/or any disclosures, non-disclosures, representations, and/or warranties by CURA. In the event of a challenge to the SECURITIZATION program by a governmental agency, the SECURITIZER may, at its sole discretion, take whatever legal steps it deems necessary to challenge an adverse ruling. However, the SECURITIZER shall have no obligation to spend more than $100,000.00 in legal fees and costs in any contract period.

**Effective:** Effective Date: June 30, 2003

**AGREED AND ACCEPTED:**

THE CURA GROUP, INC. Dated: 9/16, 2003

By: [signature]
Danny L. Pixler, President

LEADING EDGE GROUP HOLDINGS CORPORATION Dated: ________, 2003

By:____________________
Allen Hilly, President & CEO

JRSO, INC. Dated: ________, 2003

By:____________________
Michael Ward, President

MP/RK:200601267

UNITED STATES DISTRICT COURT
DISTRICT OF NEW JERSEY

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | : | Hon. SRC |
| v. | : | Criminal No. 07-35 |
| ALLEN HILLY | : | Title 18, United States Code, Sections 1343 and 2 |
| | : | Title 28, United States Code, Section 2461(c) |

# INDICTMENT

The Grand Jury in and for the District of New Jersey, sitting at Newark, charges:

## COUNTS 1 THROUGH 84
(Wire Fraud: AEG Client-Company Funds)

### The Defendant and Other Entities

1. At all times relevant to this Indictment:

a. Defendant ALLEN HILLY ["HILLY"] was a resident of West Windsor, New Jersey and had business office locations in Princeton and Bedminster, New Jersey.

b. Defendant HILLY was the Chairman of the Board and Chief Executive Officer of Professional Employer's Holding LLC ["PEH LLC"], which owned and operated various subsidiaries including but not limited to Administrative Employers Group ["AEG"], Employers Consortium Inc. ["ECI"], and Personnel Management Solutions Inc. ["PMSI"].

c. Defendant HILLY operated and controlled AEG, ECI, and PMSI as professional employer organizations ["HILLY

EXHIBIT
2

PEOs" or "his PEOs"], which were responsible for management of human resources, payroll, payroll tax compliance, and employee benefits, including health benefits and workers' compensation insurance, for their client companies. Defendant HILLY did not have signatory authority on his PEOs' bank accounts.

d. Defendant HILLY was the Chairman of the Board, Chief Executive Officer, and sole owner of Leading Edge Group Holdings Corporation ["Leading Edge"]. Defendant Hilly had sole signatory authority on Leading Edge bank accounts.

2. Among other things, defendant HILLY's PEOs were responsible for and entrusted with administering payroll and employment taxes on behalf of their client-companies and reporting, collecting, and depositing those taxes with state and federal authorities.

3. Employers and PEOs, on behalf of their client-companies, were required by law to report the withholding of taxes from employees' pay, including federal income tax, Social Security, Medicare, and other taxes, as well as the employer contributions relating to Social Security, Medicare, and other taxes [collectively, the "Federal Employment Taxes"]. With respect to these Federal Employment Taxes, employers and PEOs were required pursuant to Title 26, United States Code, Sections 3504 & 3505, to file Employers Quarterly Federal Tax Returns ["Form 941"] reporting these withholdings from their employees

and to timely deposit the corresponding taxes in full to an authorized bank or financial institution pursuant to Federal Tax Deposit Requirements.

4. Defendant HILLY's PEOs entered into contracts with their client-companies which set forth the obligations of each party. These contracts were variously entitled, among others, "Service Agreements," "Professional Employer Service Agreements," and "Employee Lease Agreements." The language of the contracts varied, but each such contract obligated defendant HILLY's PEOs to collect and pay the required Federal Employment Taxes and to prepare and timely file all required federal tax returns.

5. For example, an AEG contract with its client-companies, which was entitled "Service Agreement," provided in pertinent part:

> 1.3 Payroll Taxes: AEG shall collect and pay all payroll taxes including income tax, social security tax and other payroll taxes as may be required under State and Federal laws to be withheld from the compensation paid to employees or paid directly by an employer. As to such payroll taxes, AEG shall prepare and timely file with the proper governmental agencies or authorities all required returns and reports.

6. In addition, an ECI contract with its client-companies, which was entitled "Professional Employer Service Agreement," provided in pertinent part:

> Upon receiving payment, ECI will administer and/or provide the following professional employer services as Client's

> co-employer, payroll processing services; human resource compliance assistance; . . . administering required federal, state and local employee payments or withholdings from wages, as well as required employer payroll tax returns and remittances of employment taxes to federal, state and local taxing authorities . . . .

7. Pursuant to the contracts, the client-companies made periodic payments to defendant HILLY's PEOs which consisted, among other things, of withholdings from employees' wages for the employees' portion of Social Security, federal income tax, and other taxes, as well as payments for workers' compensation insurance premiums. Defendant HILLY's PEOs were paid administrative fees in exchange for the promised services.

**The Scheme and Artifice**

8. From in or about February 2006 through at least on or about December 13, 2006, in the District of New Jersey and elsewhere, defendant

**ALLEN HILLY**

did knowingly and willfully devise and intend to devise a scheme and artifice to defraud and to obtain money and property by means of materially false and fraudulent pretenses, representations and promises, which scheme and artifice is set forth below.

**The Object of the Scheme**

9. The object of the scheme and artifice was for defendant HILLY, through fraud and by virtue of his dominion and

control over his PEOs, to convert to his own use monies obtained by AEG, ECI, and PMSI from their client-companies.

**Means and Methods**

10. It was part of the scheme and artifice to defraud that defendant HILLY represented and caused to be represented, both verbally and in writing, to the client-companies of HILLY's PEOs that the PEOs would collect and pay all Federal Employment Taxes and prepare and timely file all required federal tax returns on behalf of the client-companies.

11. It was further part of the scheme and artifice to defraud that beginning in or about February 2006 and continuing through at least on or about December 13, 2006, defendant HILLY directed and instructed his PEOs not to file the Forms 941 with the Internal Revenue Service on behalf of the client-companies, as required under the contracts between the PEOs and their client-companies.

12. It was further part of the scheme and artifice to defraud that beginning in or about February 2006, and continuing through at least on or about December 13, 2006, defendant HILLY directed and instructed his PEOs not to transfer to the Internal Revenue Service the portion of his PEOs' client-companies' monies that represented Federal Employment Taxes due to the Internal Revenue Service.

13. It was further part of the scheme and artifice to defraud that at various times beginning in or about February 2006, and continuing through on or about December 13, 2006, defendant HILLY directed and instructed AEG, ECI, and PMSI to divert, via wire transfers, the client-companies' Federal Employment Taxes which were required to be remitted to the Internal Revenue Service to a bank account at Bank of America held in the name of Leading Edge Group Holdings Corporation (the "Bank of America Account"), on which account defendant HILLY was the sole signatory.

14. It was further part of the scheme and artifice to defraud that, during the period from in or about February 2006 through on or about November 15, 2006, defendant HILLY further diverted the client-companies' monies by causing approximately 27 wire transfers totaling approximately $10,790,000 to be sent from the Bank of America Account to investment accounts at UBS Financial Services, Inc. [the "UBS Investment Accounts"] held in the name of Leading Edge. Defendant HILLY was the sole signatory on the UBS Investment Accounts.

15. It was further part of the scheme and artifice to defraud that defendant HILLY actively concealed material facts by causing the PEOs to file the required Forms 941 and remit tax payments for client-companies that complained that his PEOs had failed to do so.

16. On or about the dates set forth below, for the purpose of executing the above scheme and artifice, in the District of New Jersey and elsewhere, defendant

**ALLEN HILLY**

did knowingly and willfully transmit and cause to be transmitted by means of wire in interstate commerce, writings, signs, signals, and sounds, that is, the transmission of wire transfers from an AEG account located in Illinois to the Bank of America Account held in the name of Leading Edge and located in New York, as set forth below:

| COUNT | DATE | AMOUNT | FROM | TO |
|---|---|---|---|---|
| 1 | 3/3/06 | $163,754.54 | AEG | Bank of America |
| 2 | 3/3/06 | $163,754.54 | AEG | Bank of America |
| 3 | 3/7/06 | $30,806.75 | AEG | Bank of America |
| 4 | 3/7/06 | $30,806.75 | AEG | Bank of America |
| 5 | 3/10/06 | $154,271.92 | AEG | Bank of America |
| 6 | 3/10/06 | $154,271.92 | AEG | Bank of America |
| 7 | 3/14/06 | $28,463.48 | AEG | Bank of America |
| 8 | 3/14/06 | $28,463.48 | AEG | Bank of America |
| 9 | 3/21/06 | $28,463.48 | AEG | Bank of America |
| 10 | 3/21/06 | $28,463.48 | AEG | Bank of America |
| 11 | 3/29/06 | $28,463.48 | AEG | Bank of America |
| 12 | 3/29/06 | $28,463.48 | AEG | Bank of America |
| 13 | 3/30/06 | $154,271.92 | AEG | Bank of America |
| 14 | 3/30/06 | $154,271.92 | AEG | Bank of America |
| 15 | 4/4/06 | $28,463.48 | AEG | Bank of America |

| | | | | |
|---|---|---|---|---|
| 16 | 4/6/06 | $154,271.92 | AEG | Bank of America |
| 17 | 4/11/06 | $28,463.48 | AEG | Bank of America |
| 18 | 4/13/06 | $154,271.92 | AEG | Bank of America |
| 19 | 4/18/06 | $28,463.48 | AEG | Bank of America |
| 20 | 4/20/06 | $154,271.92 | AEG | Bank of America |
| 21 | 4/25/06 | $28,463.48 | AEG | Bank of America |
| 22 | 4/27/06 | $154,271.92 | AEG | Bank of America |
| 23 | 5/2/06 | $28,463.48 | AEG | Bank of America |
| 24 | 5/4/06 | $154,271.92 | AEG | Bank of America |
| 25 | 5/9/06 | $28,463.48 | AEG | Bank of America |
| 26 | 5/11/06 | $154,271.92 | AEG | Bank of America |
| 27 | 5/16/06 | $28,463.48 | AEG | Bank of America |
| 28 | 5/18/06 | $154,271.92 | AEG | Bank of America |
| 29 | 5/23/06 | $28,463.48 | AEG | Bank of America |
| 30 | 5/25/06 | $154,271.92 | AEG | Bank of America |
| 31 | 6/1/06 | $154,271.92 | AEG | Bank of America |
| 32 | 6/1/06 | $34,701.65 | AEG | Bank of America |
| 33 | 6/6/06 | $35,531.87 | AEG | Bank of America |
| 34 | 6/8/06 | $154,271.92 | AEG | Bank of America |
| 35 | 6/14/06 | $28,463.48 | AEG | Bank of America |
| 36 | 6/15/06 | $164,330.44 | AEG | Bank of America |
| 37 | 6/20/06 | $28,463.48 | AEG | Bank of America |
| 38 | 6/22/06 | $153,886.12 | AEG | Bank of America |
| 39 | 6/27/06 | $37,082.16 | AEG | Bank of America |
| 40 | 6/27/06 | $35,559.33 | AEG | Bank of America |
| 41 | 7/5/06 | $37,666.77 | AEG | Bank of America |
| 42 | 7/6/06 | $139,969.97 | AEG | Bank of America |
| 43 | 7/11/06 | $35,950.15 | AEG | Bank of America |

| | | | | |
|---|---|---|---|---|
| 44 | 7/12/06 | $164,489.15 | AEG | Bank of America |
| 45 | 7/18/06 | $129,901.53 | AEG | Bank of America |
| 46 | 7/18/06 | $31,838.14 | AEG | Bank of America |
| 47 | 7/25/06 | $158,004.18 | AEG | Bank of America |
| 48 | 7/25/06 | $34,238.69 | AEG | Bank of America |
| 49 | 7/31/06 | $128,034.46 | AEG | Bank of America |
| 50 | 8/1/06 | $28,968.85 | AEG | Bank of America |
| 51 | 8/7/06 | $147,526.14 | AEG | Bank of America |
| 52 | 8/8/06 | $26,809.41 | AEG | Bank of America |
| 53 | 8/14/06 | $130,837.16 | AEG | Bank of America |
| 54 | 8/15/06 | $29,408.46 | AEG | Bank of America |
| 55 | 8/21/06 | $150,070.33 | AEG | Bank of America |
| 56 | 8/22/06 | $27,588.77 | AEG | Bank of America |
| 57 | 8/28/06 | $126,017.69 | AEG | Bank of America |
| 58 | 8/29/06 | $28,545.99 | AEG | Bank of America |
| 59 | 9/5/06 | $156,072.67 | AEG | Bank of America |
| 60 | 9/5/06 | $31,513.02 | AEG | Bank of America |
| 61 | 9/11/06 | $101,119.28 | AEG | Bank of America |
| 62 | 9/12/06 | $25,270.28 | AEG | Bank of America |
| 63 | 9/18/06 | $140,264.77 | AEG | Bank of America |
| 64 | 9/18/06 | $25,720.50 | AEG | Bank of America |
| 65 | 9/25/06 | $102,269.96 | AEG | Bank of America |
| 66 | 10/2/06 | $143,299.26 | AEG | Bank of America |
| 67 | 10/3/06 | $55,218.86 | AEG | Bank of America |
| 68 | 10/10/06 | $105,629.17 | AEG | Bank of America |
| 69 | 10/10/06 | $25,977.74 | AEG | Bank of America |
| 70 | 10/16/06 | $135,784.43 | AEG | Bank of America |
| 71 | 10/17/06 | $28,672.51 | AEG | Bank of America |

| | | | | |
|---|---|---|---|---|
| 72 | 10/23/06 | $97,300.78 | AEG | Bank of America |
| 73 | 10/24/06 | $21,866.12 | AEG | Bank of America |
| 74 | 10/30/06 | $129,701.98 | AEG | Bank of America |
| 75 | 10/31/06 | $25,108.71 | AEG | Bank of America |
| 76 | 11/6/06 | $101,525.75 | AEG | Bank of America |
| 77 | 11/7/06 | $20,051.73 | AEG | Bank of America |
| 78 | 11/13/06 | $130,772.08 | AEG | Bank of America |
| 79 | 11/13/06 | $35,450.00 | AEG | Bank of America |
| 80 | 11/14/06 | $22,176.45 | AEG | Bank of America |
| 81 | 11/20/06 | $120,397.67 | AEG | Bank of America |
| 82 | 11/21/06 | $19,180.48 | AEG | Bank of America |
| 83 | 11/27/06 | $121,738.80 | AEG | Bank of America |
| 84 | 11/28/06 | $21,084.05 | AEG | Bank of America |
| | **TOTAL** | **$6,964,469.60** | **AEG** | **Bank of America** |

All in violation of Title 18, United States Code, Sections 1343 and 2.

**COUNTS 85 THROUGH 173**
(Wire Fraud: ECI Client-Company Funds)

1. The allegations set forth in paragraphs 1 through 15 of Counts 1 through 84 of this Indictment are realleged and incorporated herein as if set forth at length.

2. On or about the dates set forth below, for the purpose of executing the scheme and artifice described in the incorporated paragraphs of Counts 1 through 84,, in the District of New Jersey and elsewhere, defendant

**ALLEN HILLY**

did knowingly and willfully transmit and cause to be transmitted by means of wire in interstate commerce, writings, signs, signals, and sounds, that is, the transmission of wire transfers from an ECI account located in Illinois to the Bank of America Account held in the name of Leading Edge and located in New York, as set forth below:

| COUNT | DATE | AMOUNT | FROM | TO |
|---|---|---|---|---|
| 85 | 2/24/06 | $300,000.00 | ECI | Bank of America |
| 86 | 3/3/06 | $250,000.00 | ECI | Bank of America |
| 87 | 3/3/06 | $250,000.00 | ECI | Bank of America |
| 88 | 3/7/06 | $15,285.50 | ECI | Bank of America |
| 89 | 3/7/06 | $15,285.50 | ECI | Bank of America |
| 90 | 3/14/06 | $12,012.78 | ECI | Bank of America |
| 91 | 3/14/06 | $12,012.78 | ECI | Bank of America |
| 92 | 3/17/06 | $200,000.00 | ECI | Bank of America |
| 93 | 3/17/06 | $200,000.00 | ECI | Bank of America |

| | | | | |
|---|---|---|---|---|
| 94 | 3/28/06 | $23,241.26 | ECI | Bank of America |
| 95 | 3/28/06 | $23,241.26 | ECI | Bank of America |
| 96 | 3/31/06 | $150,000.00 | ECI | Bank of America |
| 97 | 3/31/06 | $150,000.00 | ECI | Bank of America |
| 98 | 4/4/06 | $11,377.16 | ECI | Bank of America |
| 99 | 4/7/06 | $80,295.96 | ECI | Bank of America |
| 100 | 4/11/06 | $131,946.70 | ECI | Bank of America |
| 101 | 4/13/06 | $135,440.92 | ECI | Bank of America |
| 102 | 4/18/06 | $13,496.04 | ECI | Bank of America |
| 103 | 4/21/06 | $82,833.58 | ECI | Bank of America |
| 104 | 4/25/06 | $14,302.70 | ECI | Bank of America |
| 105 | 4/28/06 | $124,395.65 | ECI | Bank of America |
| 106 | 5/2/06 | $18,219.60 | ECI | Bank of America |
| 107 | 5/5/06 | $130,510.16 | ECI | Bank of America |
| 108 | 5/9/06 | $17,732.20 | ECI | Bank of America |
| 109 | 5/10/06 | $57,748.91 | ECI | Bank of America |
| 110 | 5/12/06 | $90,362.11 | ECI | Bank of America |
| 111 | 5/17/06 | $13,453.78 | ECI | Bank of America |
| 112 | 5/22/06 | $111,349.94 | ECI | Bank of America |
| 113 | 5/23/06 | $18,045.81 | ECI | Bank of America |
| 114 | 5/26/06 | $88,323.20 | ECI | Bank of America |
| 115 | 6/2/06 | $198,554.88 | ECI | Bank of America |
| 116 | 6/6/06 | $21,948.79 | ECI | Bank of America |
| 117 | 6/12/06 | $133,822.01 | ECI | Bank of America |
| 118 | 6/13/06 | $32,111.18 | ECI | Bank of America |
| 119 | 6/16/06 | $225,033.02 | ECI | Bank of America |
| 120 | 6/21/06 | $23,187.75 | ECI | Bank of America |
| 121 | 6/23/06 | $300,000.00 | ECI | Bank of America |

| | | | | |
|---|---|---|---|---|
| 122 | 6/27/06 | $17,630.29 | ECI | Bank of America |
| 123 | 6/30/06 | $164,690.55 | ECI | Bank of America |
| 124 | 7/5/06 | $19,621.24 | ECI | Bank of America |
| 125 | 7/7/06 | $73,745.51 | ECI | Bank of America |
| 126 | 7/11/06 | $17,697.20 | ECI | Bank of America |
| 127 | 7/13/06 | $91,700.78 | ECI | Bank of America |
| 128 | 7/17/06 | $147,827.85 | ECI | Bank of America |
| 129 | 7/18/06 | $17,098.27 | ECI | Bank of America |
| 130 | 7/25/06 | $169,741.11 | ECI | Bank of America |
| 131 | 7/25/06 | $67,943.93 | ECI | Bank of America |
| 132 | 7/25/06 | $4,573.70 | ECI | Bank of America |
| 133 | 7/31/06 | $133,064.57 | ECI | Bank of America |
| 134 | 8/1/06 | $10,617.30 | ECI | Bank of America |
| 135 | 8/7/06 | $125,380.63 | ECI | Bank of America |
| 136 | 8/8/06 | $54,504.89 | ECI | Bank of America |
| 137 | 8/8/06 | $26,227.61 | ECI | Bank of America |
| 138 | 8/14/06 | $87,309.65 | ECI | Bank of America |
| 139 | 8/15/06 | $7,862.08 | ECI | Bank of America |
| 140 | 8/18/06 | $35,335.79 | ECI | Bank of America |
| 141 | 8/21/06 | $166,592.95 | ECI | Bank of America |
| 142 | 8/22/06 | $28,826.40 | ECI | Bank of America |
| 143 | 8/28/06 | $130,017.99 | ECI | Bank of America |
| 144 | 8/29/06 | $23,680.49 | ECI | Bank of America |
| 145 | 8/29/06 | $9,865.74 | ECI | Bank of America |
| 146 | 9/5/06 | $126,721.41 | ECI | Bank of America |
| 147 | 9/5/06 | $27,369.73 | ECI | Bank of America |
| 148 | 9/12/06 | $118,791.53 | ECI | Bank of America |
| 149 | 9/12/06 | $11,512.72 | ECI | Bank of America |

| | | | | |
|---|---|---|---|---|
| 150 | 9/18/06 | $87,132.65 | ECI | Bank of America |
| 151 | 9/20/06 | $7,868.47 | ECI | Bank of America |
| 152 | 9/25/06 | $61,707.22 | ECI | Bank of America |
| 153 | 9/27/06 | $70,000.00 | ECI | Bank of America |
| 154 | 9/29/06 | $34,982.29 | ECI | Bank of America |
| 155 | 10/2/06 | $213,056.34 | ECI | Bank of America |
| 156 | 10/3/06 | $10,835.69 | ECI | Bank of America |
| 157 | 10/10/06 | $123,882.00 | ECI | Bank of America |
| 158 | 10/10/06 | $25,549.16 | ECI | Bank of America |
| 159 | 10/16/06 | $102,268.46 | ECI | Bank of America |
| 160 | 10/17/06 | $7,818.83 | ECI | Bank of America |
| 161 | 10/23/06 | $152,609.93 | ECI | Bank of America |
| 162 | 10/24/06 | $26,191.61 | ECI | Bank of America |
| 163 | 10/26/06 | $225,452.91 | ECI | Bank of America |
| 164 | 10/30/06 | $135,657.27 | ECI | Bank of America |
| 165 | 10/30/06 | $8,143.77 | ECI | Bank of America |
| 166 | 11/6/06 | $127,333.08 | ECI | Bank of America |
| 167 | 11/7/06 | $31,768.02 | ECI | Bank of America |
| 168 | 11/13/06 | $132,493.69 | ECI | Bank of America |
| 169 | 11/14/06 | $6,063.38 | ECI | Bank of America |
| 170 | 11/20/2006 | $94,527.91 | ECI | Bank of America |
| 171 | 11/21/2006 | $31,680.09 | ECI | Bank of America |
| 172 | 11/27/2006 | $85,970.49 | ECI | Bank of America |
| 173 | 11/28/2006 | $5,773.74 | ECI | Bank of America |
| | **TOTAL** | **$7,400,290.04** | **ECI** | **Bank of America** |

All in violation of Title 18, United States Code, Sections 1343 and 2.

**COUNTS 174 THROUGH 205**
(Wire Fraud: PMSI client-company funds)

1. The allegations set forth in paragraphs 1 through 15 of Counts 1 through 84 of this Indictment are realleged and incorporated herein as if set forth at length.

2. On or about the dates set forth below, for the purpose of executing the scheme and artifice described in the incorporated paragraphs of Counts 1 through 84, in the District of New Jersey and elsewhere, defendant

**ALLEN HILLY**

did knowingly and willfully transmit and cause to be transmitted by means of wire in interstate commerce, writings, signs, signals, and sounds, that is, the transmission of wire transfers from a PMSI account located in Connecticut to the Bank of America Account held in the name of Leading Edge and located in New York, as set forth below:

| COUNT | DATE | AMOUNT | FROM | TO |
|---|---|---|---|---|
| 174 | 5/17/06 | $10,278.28 | PMSI | Bank of America |
| 175 | 5/17/06 | $9,684.15 | PMSI | Bank of America |
| 176 | 5/17/06 | $629.20 | PMSI | Bank of America |
| 177 | 5/23/06 | $5,746.65 | PMSI | Bank of America |
| 178 | 6/6/06 | $3,694.08 | PMSI | Bank of America |
| 179 | 6/14/06 | $3,166.28 | PMSI | Bank of America |
| 180 | 6/20/06 | $3,443.58 | PMSI | Bank of America |
| 181 | 6/27/06 | $3,727.00 | PMSI | Bank of America |
| 182 | 7/5/06 | $3,453.50 | PMSI | Bank of America |

| | | | | |
|---|---|---|---|---|
| 183 | 7/11/06 | $3,302.31 | PMSI | Bank of America |
| 184 | 7/18/06 | $2,821.85 | PMSI | Bank of America |
| 185 | 7/25/06 | $3,021.11 | PMSI | Bank of America |
| 186 | 8/1/06 | $2,868.34 | PMSI | Bank of America |
| 187 | 8/8/06 | $3,504.68 | PMSI | Bank of America |
| 188 | 8/15/06 | $2,865.45 | PMSI | Bank of America |
| 189 | 8/21/06 | $3,446.70 | PMSI | Bank of America |
| 190 | 9/1/06 | $190,000.00 | PMSI | Bank of America |
| 191 | 9/1/06 | $3,426.92 | PMSI | Bank of America |
| 192 | 9/5/06 | $3,313.26 | PMSI | Bank of America |
| 193 | 9/12/06 | $3,056.53 | PMSI | Bank of America |
| 194 | 9/20/06 | $2,734.15 | PMSI | Bank of America |
| 195 | 9/22/06 | $43,942.33 | PMSI | Bank of America |
| 196 | 10/3/06 | $2,989.26 | PMSI | Bank of America |
| 197 | 10/3/06 | $2,886.97 | PMSI | Bank of America |
| 198 | 10/10/06 | $2,951.45 | PMSI | Bank of America |
| 199 | 10/17/06 | $3,039.13 | PMSI | Bank of America |
| 200 | 10/24/06 | $2,901.86 | PMSI | Bank of America |
| 201 | 10/31/06 | $2,693.91 | PMSI | Bank of America |
| 202 | 11/7/06 | $2,828.97 | PMSI | Bank of America |
| 203 | 11/14/06 | $2,438.12 | PMSI | Bank of America |
| 204 | 11/21/06 | $2,586.02 | PMSI | Bank of America |
| 205 | 11/28/06 | $2,940.37 | PMSI | Bank of America |
| | **TOTAL** | **$340,382.41** | **PMSI** | **Bank of America** |

All in violation of Title 18, United States Code, Sections 1343 and 2.

**COUNTS 206 THROUGH 231**
(Wire Fraud: Transfers to UBS Investment Accounts)

1. The allegations set forth in paragraphs 1 through 15 of Counts 1 through 84 of this Indictment are realleged and incorporated herein as if set forth at length.

2. On or about the dates set forth below, for the purpose of executing the scheme and artifice described in the incorporated paragraphs of Counts 1 through 84, in the District of New Jersey and elsewhere, defendant

**ALLEN HILLY**

did knowingly and willfully transmit and cause to be transmitted by means of wire in interstate commerce, writings, signs, signals, and sounds, that is, the transmission of wire transfers from the Bank of America Account held in the name of Leading Edge and located in New York to the UBS Investment Accounts, which were located in Connecticut, as set forth below:

| COUNT | DATE | AMOUNT | FROM | TO |
|---|---|---|---|---|
| 206 | 2/24/06 | $300,000.00 | Bank of America | UBS |
| 207 | 3/3/06 | $250,000.00 | Bank of America | UBS |
| 208 | 3/13/06 | $300,000.00 | Bank of America | UBS |
| 209 | 3/17/06 | $250,000.00 | Bank of America | UBS |
| 210 | 3/31/06 | $300,000.00 | Bank of America | UBS |
| 211 | 4/7/06 | $250,000.00 | Bank of America | UBS |
| 212 | 4/12/06 | $300,000.00 | Bank of America | UBS |
| 213 | 4/17/06 | $300,000.00 | Bank of America | UBS |

| | | | | |
|---|---|---|---|---|
| 214 | 4/26/06 | $300,000.00 | Bank of America | UBS |
| 215 | 5/11/06 | $215,000.00 | Bank of America | UBS |
| 216 | 5/18/06 | $300,000.00 | Bank of America | UBS |
| 217 | 5/26/06 | $250,000.00 | Bank of America | UBS |
| 218 | 6/2/06 | $375,000.00 | Bank of America | UBS |
| 219 | 6/16/06 | $600,000.00 | Bank of America | UBS |
| 220 | 6/26/06 | $460,000.00 | Bank of America | UBS |
| 221 | 7/6/06 | $400,000.00 | Bank of America | UBS |
| 222 | 7/26/06 | $850,000.00 | Bank of America | UBS |
| 223 | 8/7/06 | $450,000.00 | Bank of America | UBS |
| 224 | 8/15/06 | $250,000.00 | Bank of America | UBS |
| 225 | 8/22/06 | $425,000.00 | Bank of America | UBS |
| 226 | 9/5/06 | $375,000.00 | Bank of America | UBS |
| 227 | 9/18/06 | $600,000.00 | Bank of America | UBS |
| 228 | 9/26/06 | $400,000.00 | Bank of America | UBS |
| 229 | 10/13/06 | $660,000.00 | Bank of America | UBS |
| 230 | 10/27/06 | $500,000.00 | Bank of America | UBS |
| 231 | 11/15/06 | $560,000.00 | Bank of America | UBS |
| | **TOTAL** | **$10,220,000.00** | **Bank of America** | **UBS** |

All in violation of Title 18, United States Code, Sections 1343 and 2.

**FORFEITURE ALLEGATIONS**

1. The grand jury realleges and incorporates by reference the allegations contained in all paragraphs of Counts 1 through 231 of this Indictment for the purpose of noticing forfeitures pursuant to Title 28, United States Code, Section 2461(c).

2. Pursuant to Title 28, United States Code, Section 2461(c), and Title 18, United States Code, Section 981(a)(1)(C), upon conviction of the offenses set forth in Counts 1 through 231 of this Indictment, the defendant shall forfeit to the United States any and all property, real or personal, that constitutes or is derived from proceeds traceable to the violations of Title 18, United States Code, Section 1343, alleged in Counts 1 through 231 of this Indictment.

3. If by any act or omission of the defendant, any of the property subject to forfeiture described in paragraph 2 herein:

a. cannot be located upon the exercise of due diligence;

b. has been transferred or sold to, or deposited with a third party,

c. has been placed beyond the jurisdiction of the court;

d. has been substantially diminished in value; or

e. has been commingled with other property which cannot be subdivided without difficulty,

it is the intent of the United States, pursuant to Title 21, United States Code, Section 853(p), to seek forfeiture of any other property of the defendants up to the value of the property described above in paragraph 2.

Pursuant to Title 28, United States Code, Section 2461(c).

Christopher J. Christie
CHRISTOPHER J. CHRISTIE
United States Attorney

CASE NUMBER: 06-4076

United States District Court
District of New Jersey

UNITED STATES OF AMERICA

v.

ALLEN HILLY

**INDICTMENT**

**18 U.S.C. §§ 1343 and 2**

**28 U.S.C. § 2461 (c)**

CHRISTOPHER J. CHRISTIE
*U.S. ATTORNEY NEWARK, NEW JERSEY*

ROBERT KIRSCH, CHRISTOPHER J. KELLY
*ASSISTANT U.S. ATTORNEYS*
*NEWARK, NEW JERSEY*
*(973) 645-2903/6112*

# UNITED STATES DISTRICT COURT
# DISTRICT OF NEW JERSEY

**UNITED STATES OF AMERICA** :

**v.** :

**ALLEN HILLY** :

**CRIMINAL COMPLAINT**

**Magistrate No. 06-** 4076

I, the undersigned complainant being duly sworn state the following is true and correct to the best of my knowledge and belief. From at least in or about February 2006 to on or about December 12, 2006, in Princeton, in the District of New Jersey and elsewhere, defendant did:

SEE ATTACHMENT A

In violation of Title 18, United States Code, Sections 1343, 1956, and 2.

I further state that I am a Special Agent of the Federal Bureau of Investigation and that this complaint is based on the following facts:

SEE ATTACHMENT B

Patrick J. Moran
Special Agent
Federal Bureau of Investigation

Sworn to before me and subscribed in my presence,

December 12, 2006 at Newark, New Jersey
Date 5:10 p.m. City and State

Honorable Claire C. Cecchi
United States Magistrate Judge
Name & Title of Judicial Officer

Signature of Judicial Officer

EXHIBIT
tabbles
3

ATTACHMENT A

COUNTS 1 - 79 (Wire Fraud)

For the purpose of executing a scheme or artifice to defraud and to obtain money and property by means of false and fraudulent pretenses, representations, and promises, defendant

ALLEN HILLY

transmitted and cause to be transmitted by means of wire in interstate commerce, writings, signs, signals, and sounds, that is, he caused the transmission of wire transfers to and from an account at Bank of America held in the name of Leading Edge Holdings Corporation on the dates and in the amounts set forth below:

| Count | Date | Amount | From | To |
|---|---|---|---|---|
| 1 | 9/5/2006 | $156,072.67 | AEG | Bank of America |
| 2 | 9/5/2006 | $31,513.02 | AEG | Bank of America |
| 3 | 9/11/2006 | $101,119.28 | AEG | Bank of America |
| 4 | 9/12/2006 | $25,270.28 | AEG | Bank of America |
| 5 | 9/18/2006 | $140,264.77 | AEG | Bank of America |
| 6 | 9/18/2006 | $25,720.50 | AEG | Bank of America |
| 7 | 9/25/2006 | $102,269.96 | AEG | Bank of America |
| 8 | 10/2/2006 | $143,299.26 | AEG | Bank of America |
| 9 | 10/3/2006 | $55,218.86 | AEG | Bank of America |
| 10 | 10/10/2006 | $105,629.17 | AEG | Bank of America |
| 11 | 10/10/2006 | $25,977.74 | AEG | Bank of America |
| 12 | 10/16/2006 | $135,784.43 | AEG | Bank of America |
| 13 | 10/17/2006 | $28,672.51 | AEG | Bank of America |
| 14 | 10/23/2006 | $97,300.78 | AEG | Bank of America |
| 15 | 10/24/2006 | $21,866.12 | AEG | Bank of America |
| 16 | 10/30/2006 | $129,701.98 | AEG | Bank of America |
| 17 | 10/31/2006 | $25,108.71 | AEG | Bank of America |
| 18 | 11/6/2006 | $101,525.75 | AEG | Bank of America |
| 19 | 11/7/2006 | $20,051.73 | AEG | Bank of America |
| 20 | 11/13/2006 | $130,772.08 | AEG | Bank of America |
| 21 | 11/13/2006 | $35,450.00 | AEG | Bank of America |
| 22 | 11/14/2006 | $22,176.45 | AEG | Bank of America |
| 23 | 11/20/2006 | $120,397.67 | AEG | Bank of America |
| 24 | 11/21/2006 | $19,180.48 | AEG | Bank of America |
| 25 | 11/27/2006 | $121,738.80 | AEG | Bank of America |

| | | | | |
|---|---|---|---|---|
| 26 | 11/28/2006 | $21,084.05 | AEG | Bank of America |
| | | | | |
| | TOTAL | $1,943,167.05 | AEG | Bank of America |

| | | | | |
|---|---|---|---|---|
| 27 | 9/5/2006 | $126,721.41 | ECI | Bank of America |
| 28 | 9/5/2006 | $27,369.73 | ECI | Bank of America |
| 29 | 9/12/2006 | $118,791.53 | ECI | Bank of America |
| 30 | 9/12/2006 | $11,512.72 | ECI | Bank of America |
| 31 | 9/18/2006 | $87,132.65 | ECI | Bank of America |
| 32 | 9/20/2006 | $7,868.47 | ECI | Bank of America |
| 33 | 9/25/2006 | $61,707.22 | ECI | Bank of America |
| 34 | 9/27/2006 | $70,000.00 | ECI | Bank of America |
| 35 | 9/29/2006 | $34,982.29 | ECI | Bank of America |
| 36 | 10/2/2006 | $213,056.34 | ECI | Bank of America |
| 37 | 10/3/2006 | $10,835.69 | ECI | Bank of America |
| 38 | 10/10/2006 | $123,882.00 | ECI | Bank of America |
| 39 | 10/10/2006 | $25,549.16 | ECI | Bank of America |
| 40 | 10/16/2006 | $102,268.46 | ECI | Bank of America |
| 41 | 10/17/2006 | $7,818.83 | ECI | Bank of America |
| 42 | 10/23/2006 | $152,609.93 | ECI | Bank of America |
| 43 | 10/24/2006 | $26,191.61 | ECI | Bank of America |
| 44 | 10/26/2006 | $225,452.91 | ECI | Bank of America |
| 45 | 10/30/2006 | $135,657.27 | ECI | Bank of America |
| 46 | 10/30/2006 | $8,143.77 | ECI | Bank of America |
| 47 | 11/6/2006 | $127,333.08 | ECI | Bank of America |
| 48 | 11/7/2006 | $31,768.02 | ECI | Bank of America |
| 49 | 11/13/2006 | $132,493.69 | ECI | Bank of America |
| 50 | 11/14/2006 | $6,063.38 | ECI | Bank of America |
| 51 | 11/20/2006 | $94,527.91 | ECI | Bank of America |
| 52 | 11/21/2006 | $31,680.09 | ECI | Bank of America |
| | | | | |
| | TOTAL | $2,093,162.39 | ECI | Bank of America |

| Count | Date | Amount | From | To |
|---|---|---|---|---|
| 53 | 2/24/2006 | $300,000.00 | Bank of America | UBS |
| 54 | 3/3/2006 | $250,000.00 | Bank of America | UBS |
| 55 | 3/13/2006 | $300,000.00 | Bank of America | UBS |
| 56 | 3/17/2006 | $250,000.00 | Bank of America | UBS |
| 57 | 3/31/2006 | $300,000.00 | Bank of America | UBS |

| | | | | |
|---|---|---|---|---|
| 58 | 4/7/2006 | $250,000.00 | Bank of America | UBS |
| 59 | 4/12/2006 | $300,000.00 | Bank of America | UBS |
| 60 | 4/17/2006 | $300,000.00 | Bank of America | UBS |
| 61 | 4/26/2006 | $300,000.00 | Bank of America | UBS |
| 62 | 5/5/2006 | $570,000.00 | Bank of America | UBS |
| 63 | 5/11/2006 | $215,000.00 | Bank of America | UBS |
| 64 | 5/18/2006 | $300,000.00 | Bank of America | UBS |
| 65 | 5/26/2006 | $250,000.00 | Bank of America | UBS |
| 66 | 6/2/2006 | $375,000.00 | Bank of America | UBS |
| 67 | 6/16/2006 | $600,000.00 | Bank of America | UBS |
| 68 | 6/26/2006 | $460,000.00 | Bank of America | UBS |
| 69 | 7/6/2006 | $400,000.00 | Bank of America | UBS |
| 70 | 7/26/2006 | $850,000.00 | Bank of America | UBS |
| 71 | 8/7/2006 | $450,000.00 | Bank of America | UBS |
| 72 | 8/15/2006 | $250,000.00 | Bank of America | UBS |
| 73 | 8/22/2006 | $425,000.00 | Bank of America | UBS |
| 74 | 9/5/2006 | $375,000.00 | Bank of America | UBS |
| 75 | 9/18/2006 | $600,000.00 | Bank of America | UBS |
| 76 | 9/26/2006 | $400,000.00 | Bank of America | UBS |
| 77 | 10/13/2006 | $660,000.00 | Bank of America | UBS |
| 78 | 10/27/2006 | $500,000.00 | Bank of America | UBS |
| 79 | 11/15/2006 | $560,000.00 | Bank of America | UBS |
| | | | | |
| | TOTAL | $10,790,000.00 | Bank of America | UBS |

COUNTS 80-158 (MONEY LAUNDERING)

The defendant,

ALLEN HILLY,

knowing that the property involved ina financial transaction represented the proceeds of some form of unlawful activity, and knowing that the transaction was designed in whole or in part to conceal and disguise the nature, source, and ownership of the proceeds of specified unlawful activity, namely wire fraud, did conduct and attempt to conduct a financial transaction affecting interstate commerce, namely wire transfers in the approximate amounts and on the dates listed below:

| Count | Date | Amount | From | To |
|---|---|---|---|---|
| 80 | 9/5/2006 | $156,072.67 | AEG | Bank of America |
| 81 | 9/5/2006 | $31,513.02 | AEG | Bank of America |
| 82 | 9/11/2006 | $101,119.28 | AEG | Bank of America |
| 83 | 9/12/2006 | $25,270.28 | AEG | Bank of America |
| 84 | 9/18/2006 | $140,264.77 | AEG | Bank of America |
| 85 | 9/18/2006 | $25,720.50 | AEG | Bank of America |
| 86 | 9/25/2006 | $102,269.96 | AEG | Bank of America |
| 87 | 10/2/2006 | $143,299.26 | AEG | Bank of America |
| 88 | 10/3/2006 | $55,218.86 | AEG | Bank of America |
| 89 | 10/10/2006 | $105,629.17 | AEG | Bank of America |
| 90 | 10/10/2006 | $25,977.74 | AEG | Bank of America |
| 91 | 10/16/2006 | $135,784.43 | AEG | Bank of America |
| 92 | 10/17/2006 | $28,672.51 | AEG | Bank of America |
| 93 | 10/23/2006 | $97,300.78 | AEG | Bank of America |
| 94 | 10/24/2006 | $21,866.12 | AEG | Bank of America |
| 95 | 10/30/2006 | $129,701.98 | AEG | Bank of America |
| 96 | 10/31/2006 | $25,108.71 | AEG | Bank of America |
| 97 | 11/6/2006 | $101,525.75 | AEG | Bank of America |
| 98 | 11/7/2006 | $20,051.73 | AEG | Bank of America |
| 99 | 11/13/2006 | $130,772.08 | AEG | Bank of America |
| 100 | 11/13/2006 | $35,450.00 | AEG | Bank of America |
| 101 | 11/14/2006 | $22,176.45 | AEG | Bank of America |
| 102 | 11/20/2006 | $120,397.67 | AEG | Bank of America |
| 103 | 11/21/2006 | $19,180.48 | AEG | Bank of America |
| 104 | 11/27/2006 | $121,738.80 | AEG | Bank of America |
| 105 | 11/28/2006 | $21,084.05 | AEG | Bank of America |

| | | | | |
|---|---|---|---|---|
| | | | | |
| | TOTAL | $1,943,167.05 | AEG | Bank of America |

| | | | | |
|---|---|---|---|---|
| 106 | 9/5/2006 | $126,721.41 | ECI | Bank of America |
| 107 | 9/5/2006 | $27,369.73 | ECI | Bank of America |
| 108 | 9/12/2006 | $118,791.53 | ECI | Bank of America |
| 109 | 9/12/2006 | $11,512.72 | ECI | Bank of America |
| 110 | 9/18/2006 | $87,132.65 | ECI | Bank of America |
| 111 | 9/20/2006 | $7,868.47 | ECI | Bank of America |
| 112 | 9/25/2006 | $61,707.22 | ECI | Bank of America |
| 113 | 9/27/2006 | $70,000.00 | ECI | Bank of America |
| 114 | 9/29/2006 | $34,982.29 | ECI | Bank of America |
| 115 | 10/2/2006 | $213,056.34 | ECI | Bank of America |
| 116 | 10/3/2006 | $10,835.69 | ECI | Bank of America |
| 117 | 10/10/2006 | $123,882.00 | ECI | Bank of America |
| 118 | 10/10/2006 | $25,549.16 | ECI | Bank of America |
| 119 | 10/16/2006 | $102,268.46 | ECI | Bank of America |
| 120 | 10/17/2006 | $7,818.83 | ECI | Bank of America |
| 121 | 10/23/2006 | $152,609.93 | ECI | Bank of America |
| 122 | 10/24/2006 | $26,191.61 | ECI | Bank of America |
| 123 | 10/26/2006 | $225,452.91 | ECI | Bank of America |
| 124 | 10/30/2006 | $135,657.27 | ECI | Bank of America |
| 125 | 10/30/2006 | $8,143.77 | ECI | Bank of America |
| 126 | 11/6/2006 | $127,333.08 | ECI | Bank of America |
| 127 | 11/7/2006 | $31,768.02 | ECI | Bank of America |
| 128 | 11/13/2006 | $132,493.69 | ECI | Bank of America |
| 129 | 11/14/2006 | $6,063.38 | ECI | Bank of America |
| 130 | 11/20/2006 | $94,527.91 | ECI | Bank of America |
| 131 | 11/21/2006 | $31,680.09 | ECI | Bank of America |
| | | | | |
| | TOTAL | $2,093,162.39 | ECI | Bank of America |

| Count | Date | Amount | From | To |
|---|---|---|---|---|
| 132 | 2/24/2006 | $300,000.00 | Bank of America | UBS |
| 133 | 3/3/2006 | $250,000.00 | Bank of America | UBS |
| 134 | 3/13/2006 | $300,000.00 | Bank of America | UBS |
| 135 | 3/17/2006 | $250,000.00 | Bank of America | UBS |
| 136 | 3/31/2006 | $300,000.00 | Bank of America | UBS |
| 137 | 4/7/2006 | $250,000.00 | Bank of America | UBS |

| | | | | |
|---|---|---|---|---|
| 138 | 4/12/2006 | $300,000.00 | Bank of America | UBS |
| 139 | 4/17/2006 | $300,000.00 | Bank of America | UBS |
| 140 | 4/26/2006 | $300,000.00 | Bank of America | UBS |
| 141 | 5/5/2006 | $570,000.00 | Bank of America | UBS |
| 142 | 5/11/2006 | $215,000.00 | Bank of America | UBS |
| 143 | 5/18/2006 | $300,000.00 | Bank of America | UBS |
| 144 | 5/26/2006 | $250,000.00 | Bank of America | UBS |
| 145 | 6/2/2006 | $375,000.00 | Bank of America | UBS |
| 146 | 6/16/2006 | $600,000.00 | Bank of America | UBS |
| 147 | 6/26/2006 | $460,000.00 | Bank of America | UBS |
| 148 | 7/6/2006 | $400,000.00 | Bank of America | UBS |
| 149 | 7/26/2006 | $850,000.00 | Bank of America | UBS |
| 150 | 8/7/2006 | $450,000.00 | Bank of America | UBS |
| 151 | 8/15/2006 | $250,000.00 | Bank of America | UBS |
| 152 | 8/22/2006 | $425,000.00 | Bank of America | UBS |
| 153 | 9/5/2006 | $375,000.00 | Bank of America | UBS |
| 154 | 9/18/2006 | $600,000.00 | Bank of America | UBS |
| 155 | 9/26/2006 | $400,000.00 | Bank of America | UBS |
| 156 | 10/13/2006 | $660,000.00 | Bank of America | UBS |
| 157 | 10/27/2006 | $500,000.00 | Bank of America | UBS |
| 158 | 11/15/2006 | $560,000.00 | Bank of America | UBS |
| | | | | |
| | TOTAL | $10,790,000.00 | Bank of America | UBS |

ATTACHMENT B

I, Patrick J. Moran, am a Special Agent with the Federal Bureau of Investigation. upon my investigation and my discussions with other individuals involved in this investigation, I have knowledge of the following facts:

1. Together with agents of the Internal Revenue Service, I am participating in an investigation of Allen Hilly, who is believed to reside at 110 N. Barrow Place, Princeton, New Jersey.

2. Hilly is the managing partner/director of Professional Employer's Holding LLC ("PEH LLC") which owns and operates a number of subsidiaries including but not limited to Personnel Management Solutions Inc. ("PMSI"), Employers Consortium Inc. ("ECI"), and Administrative Employers Group ("AEG"). PEH LLC subsidiaries PMSI, ECI, and AEG are considered Professional Employer Organizations ("PEOs").

3. As explained by the National Association of Professional Employer Organizations, an industry organization:

> Professional employer organizations (PEOs) enable clients to cost-effectively outsource the management of human resources, employee benefits, payroll and workers' compensation. PEO clients focus on their core competencies to maintain and grow their bottom line.
>
> Businesses today need help managing increasingly complex employee related matters such as health benefits, workers' compensation claims, payroll, payroll tax compliance, and unemployment insurance claims. They contract with a PEO to assume these responsibilities and provide expertise in human resources management. This allows the PEO client to concentrate on the operational and revenue-producing side of its operations. [National Association of Professional Employer Organizations, "What Is a Professional Employer Organization?," http://www.napeo.org/peoindustry/definition. cfm.]

Among other things, PEOs are responsible for and entrusted to administer payroll and employment taxes on behalf of their company-clients and reporting, collecting, and depositing employment taxes with state and federal authorities.

4. PEOs generally enter into contracts with their clients setting forth the obligations of each party. I have had an opportunity to review contracts used by three of Hilly's companies, AEG, ECI, and PMSI. The AEG contract, which is entitled "Service Agreement," provides that AEG will process and issue employees' paychecks and that:

> 1.3 Payroll Taxes: AEG shall collect and pay all payroll taxes including income tax, social security tax and other payroll taxes as may be required under State and Federal laws to be withheld from the compensation paid to employees or paid directly by an employer. As to such payroll taxes, AEG shall prepare and timely file with the proper governmental agencies or authorities all required returns and reports.

5. The ECI contract, which is entitled "Professional Employer Service Agreement," explains that:

> ECI is what is commonly referred to as a Professional Employer Organization ("PEO"). As a PEO, ECI provides integrated management and administration of elements of the human resources and employer risk of its clients by contractually assuming its rights, responsibilities and risks through the establishment and maintenance of an employer relationship with the workers assigned to its clients.

After reciting the client's obligation to make payments to ECI, the contract provides as follows:

> Upon receiving payment, ECI will administer and/or provide the following professional employer services as Client's co-employer, payroll processing services; human resource compliance assistance; . . . administering required federal, state and local employee payments or withholdings from wages, as well as required employer payroll tax returns and remittances of employment taxes to federal, state and local taxing authorities; and, such other services as may be mutually agreed upon.

The ECI contract further provides that:

> ECI will be deemed the W-2 employer for Client Worksite Employees for purposes of the withholding and payment of all employment taxes in connection with the wages ECI pays to these employees. ECI shall be solely responsible for making all applicable payroll withholdings and tax filings of Client Worksite Employees under the terms of this Agreement and payment of all applicable federal, state and local income, social security, disability and unemployment taxes.

6. The PMSI contract, which is entitled "Employee Lease Agreement," provides in pertinent part that PMSI "shall be responsible for payment of all compensation, benefits and employer taxes relating to such persons (including workers' compensation and disability)."

7. Employers and PEOs are required by law to report the withholding of taxes from employees' pay, including federal, social security, state, local, and other taxes.

With respect to federal income taxes and social security, for example, employers and PEOs are required to report withholdings from their employees on an Employers Quarterly Federal Tax Return ("Form 941") and to deposit these taxes in full to an authorized bank or financial institution pursuant to Federal Tax Deposit Requirements. See 26 U.S.C. §§ 3504 & 3505.

8. The federal income tax is a "pay as you go tax." Taxpayers are required to pay the tax as income is received during the year. The pay-as-you-go system was designed to ensure that taxpayers meet their tax obligations in a timely fashion without having to pay a huge tax bill when filing their required tax returns.

9. Employers and PEOs who do not comply with the employment tax laws may be subject to criminal and civil sanctions for willfully failing to pay employment taxes. 26 U.S.C. § 7202 (Willful Failure to Collect or Pay Over Tax); 26 U.S.C. § 7201 (Attempt to Evade or Defeat Tax).

10. Since on or about February of 2006, Hilly has caused the companies he controls to fail to pay over to the Internal Revenue Service employment taxes collected from the employees of over 100 company-clients. These employment taxes, which include federal income tax withholdings, the employer and employee portions of social security taxes, and Medicare taxes, often exceed $250,000 per week. Hilly has instructed personnel working at AEG, ECI, and PMSI to wire the withheld employment taxes intended for the Internal Revenue Service to his Bank of America Account.

11. I have reviewed a series of emails sent between Hilly and an employee of AEG. Beginning in early February 2006, Hilly instructed the employee to forward AEG's tax withholdings to the Bank of America Account. The employee informed Hilly that due to the amount of taxes withheld the company was required to remit the funds to the Internal Revenue Service on a frequent basis, and failure to do so would result in the assessment and imposition of penalties and interest. Hilly responded that the tax payments should be wired to the Bank of America Account as previously instructed, indicating that the taxes would be paid later and any penalties and interest would be paid. A follow-up email sent by Hilly on March 27, 2006 instructed Curci to cease transmitting employment taxes to the Internal Revenue Service altogether, but to transmit those funds to the Bank of America Account instead, a process he referred to as "re-capture."

12. I have also been informed about recordings of telephone calls made by a cooperating witness ("CW") to Hilly to confirm that Hilly knew and endorsed the wiring of tax receipts to the Bank of America Account. Hilly indicated that he was using the money to fund certain personal "investment vehicles" and was aware of the current shortfalls to client-company tax accounts. Hilly stated that he would seek to pay back the Internal Revenue Service "when the time comes."

13. In recent conversations with employees of his companies, Hilly has stated that he intends to "blow up" AEG, ECI, and PMSI and either restructure them or close them by the end of the year.

14. Internal Revenue Service transcripts of account confirm that in or about February 2006, ECI, AEG, and PMSI ceased making required weekly federal tax deposits with the Internal Revenue Service. Additionally, each company has failed to file its Form 941, Employer's Quarterly Tax Return, for one or more of the periods ending March 31, 2006, June 30, 2006, and September 30, 2006. The returns in question were due by April 30, 2006, July 31, 2006, and October 31, 2006, respectively.

15. In addition to employment taxes, AEG, ECI, and PMSI receive workers' compensation premiums from their company-clients, with which they are expected to purchase workers' compensation coverage for the companies' employees. According to the AEG contract cited above, "AEG shall obtain and pay the costs of providing all necessary and legally required Workers' Compensation Insurance. AEG shall furnish to Client a Certificate of Insurance evidencing the issuance to AEG and maintenance by AEG of policies providing such coverage." Similarly, the ECI contract provides that "ECI shall obtain and maintain adequate workers compensation insurance for all covered Client Worksite Employees, . . . and shall keep such coverage in force and effect at all times during and relating to the term of this Agreement, for all of the Client Worksite Employees." Despite these obligations, Hilly has instructed personnel working at AEG, ECI, and PMSI to wire the funds received as workers' compensation premiums to his Bank of America Account.

16. Bank statements for the Bank of America Account indicate that during the period from February 24, 2006, through November 28, 2006, 84 wire transfers totaling $6,771,921.31 were made from ECI's bank account into the Bank of America Account.

17. Bank statements for the Bank of America Account indicate that during the period from March 3, 2006, through November 28, 2006, 77 wire transfers totaling $6,375,974.03 were made from AEG's bank account into the Bank of America Account.

18. Bank statements for the Bank of America Account indicate that during the period of May 17, 2006, through November 28, 2006, 32 wire transfers totaling $340,382.41 were made from PMSI's bank account into the Bank of America Account.

19. In total, at least 193 wire transfers were made from the business accounts of ECI, AEG, and PMSI, representing at least $13,488,277.75 in diverted payroll tax receipts and workers' compensation premiums, into the Bank of America Account.

20. Allen Hilly is the sole signatory as to the Bank of America Account, which is held in the name of Leading Edge Holdings Corporation, a company that has no legal relationship with ECI, AEG, or PMSI. I have reviewed the transcript of a deposition of Allen Hilly taken in February 2004 in which he testified under oath that Leading Edge

Holdings Corporation was formed on January 1, 2001; that no shares of Leading Edge Holdings Corporation stock had ever been issued; that its sole capital had been contributed by himself; that he was the exclusive shareholder of the company; and that no one else was involved in the company. In other words, Leading Edge Holdings Corporation is a shell company that is the alter ego for Allen Hilly.

21. During the period from February 24, 2006, through November 15, 2006, Hilly caused 27 wire transfers totaling $10,790,000 to be sent from the Bank of America Account to UBS Account Nos. 24073 and 54379. These UBS accounts are investment accounts that are, like the Bank of America Account, held in the name of Leading Edge Group Holdings Corporation, Hilly's alter ego.

22. As noted above, as of December 12, 2006, according to an employee of UBS Financial Services, Inc., the balance in UBS Account No. 24073 is $7,598,343.09 and the balance in UBS Account No. 54379 is $6,930,033.94. At least since January 2006, the account has been solely funded by wires from the Bank of America Account. The difference between the deposits described in the preceding paragraph and the current balance is believed to reflect, at least in part, increases in the value of the investment.

23. In summary, Allen Hilly has instructed his employees to utilize wire transfers to divert payroll taxes and workers' compensation premiums to the Subject Accounts, all of which he controls personally and two of which are investment accounts, despite his contractual and legal obligations to utilize those funds on behalf of his clients. By doing so, he has defrauded and continues to defraud those clients.

24. Allen Hilly has utilized and is utilizing the Subject Accounts, which are held in the name of a shell corporation, to conceal and disguise the nature, the source, and the true ownership of the proceeds of wire fraud.

# REGULATION OF EMPLOYEE LEASING COMPANIES TO PREVENT INSURANCE AND TAX ABUSES

*By Lynn E. Szymoniak, Esq.*
*January 12, 2007*

## BACKGROUND

In 2006, the employee leasing industry had some spectacular successes as well as some very public failures including criminal prosecutions. Employee leasing companies (or "PEOs") lease employees to other businesses. They also provide payroll and benefit administration, workers' compensation and health insurance, tax filings, retirement planning, and other human resources services for the leased employees. According to the National Association of Professional Employer Organizations ("NAPEO"), the PEO industry in 2006 was comprised of approximately 700 firms that generated gross revenues (including payroll, taxes, and insurance premiums) of $51 billion. In total, the PEO industry serviced between two and three million employees.

Regarding successes, from the beginning of 2003 until the end of the first quarter of 2006, three public PEOs - Gevity, Barrett, and Administaff - saw share-price increases of 530 percent, 1,204 percent, and 797 percent, respectively. More workers' compensation insurance companies agreed to voluntarily insure employee leasing companies. Established employee leasing companies were targeted for acquisition by larger financial services companies.

EXHIBIT

tabbies

4

Regarding bad news, a year of bad publicity for the employee leasing industry ended on December 27, 2006, when federal court Judge Virginia M. Hernandez Covington accepted the plea agreement of Michael Lee McCafferty in Jacksonville, Florida. McCafferty formerly headed TTC Illinois, the largest privately-held employee leasing company in the nation. For five consecutive years, TTC Illinois was listed by Forbes among the 500 largest privately-held companies in the nation. Sentencing was set for February 15, 2007.

On December 15, 2006, two leaders of a nationwide employee-leasing conspiracy that exploited hundreds of illegal aliens throughout the United States were sentenced to terms in prison. Jozef Bronislaw Bogacki, a native of Poland and naturalized U.S. citizen residing in Clearwater, Florida, was sentenced to 57 months in prison and ordered to pay restitution of $950,000. Bogacki was also ordered to forfeit six pieces of real property valued at approximately $500,000. Jaroslaw "Jerry" Sawczuk, a Polish and Canadian citizen formerly of Coral Springs, Florida, was sentenced to 51 months in prison and ordered to pay restitution of $950,000. Sawczuk was ordered to surrender to the Department of Homeland Security at the end of his sentence, and cannot enter the United States again without the consent of the Attorney General. Bogacki and Sawczuk were the leaders of a six-person nationwide employee-leasing conspiracy that exploited hundreds of illegal aliens throughout the United States, responsible for laundering over $20 million and defrauding the U.S. Treasury of at least $5.7 million. A third defendant in the conspiracy, Pavel Preus, a Slovak citizen residing in Pompano Beach, Florida, was sentenced on September 13, 2006 to 37 months in prison. Bogacki, Sawczuk and Preus had all pled guilty to charges of conspiracy to transport, house and otherwise encourage illegal aliens to remain in the United States, and to

commit visa, wire, mail and tax fraud, and money laundering. The remaining defendants -- Lucia Kanis, Ivan Kanis and Andor Pikali, all Slovak citizens who resided in Coral Springs, Florida -- are fugitives and believed to be overseas. An indictment naming the six defendants, returned by a federal grand jury on January 13, 2005, alleged that the defendants formed numerous sham corporations in Florida and, through these corporations, contacted legitimate businesses throughout the United States, such as farms, dairies, food plants and factories, and offered the services of "work-authorized" leased workers. The defendants promised these businesses that the defendants would contribute to, collect and pay over Social Security and Medicare contributions, and federal and state income taxes. Instead, the defendants supplied unauthorized immigrant workers and never made the required payroll tax payments, keeping over $5.7 million in unpaid taxes and contributions for their own use.

Also on December 15, 2006, Jose David Kaufman entered into a plea agreement relating to a criminal information filed against him. Kaufman was originally indicted on August 16, 2005, and charged with providing fraudulent letters of credit for $47.5 million to two employee leasing companies, Certified Services and The Cura Group, as collateral for workers' compensation insurance policies issued by CNA. Sentencing for Kaufman was set for March 7, 2007. Two defendants, Otha Ray McCartha and Charles Spinelli, were indicted with Kaufman. Trial for McCartha and Spinelli was set for March 19, 2007.

On the previous day, December 14, 2006, Allen Hilly, an Iraqi citizen, was indicted in Newark, New Jersey. Hilly was charged in federal court in Newark, New Jersey, with 158 counts of money laundering and wire fraud. Through his company, Leading Edge Holding Corporation, Hilly was involved with several large

employee leasing companies, including Professional Employers' Holding, LLC. Subsidiaries of Professional Employer's Holding, LLC identified in court documents included Personnel Management Solutions, Inc. ("PMSI"), Employer's Consortium, Inc. ("ECI"), and Administrative Employers Group ("AEG"). According to prosecutors, Hilly diverted funds from clients intended for IRS payments. Hilly has also been accused by state insurance regulators of selling workers' compensation insurance which he was not authorized to sell. Prosecutors believe that in the past few years, Hilly diverted $13.4 million intended to be payment for workers' compensation premium and employments taxes.

On November 6, 2006, in Tampa, Florida, Robert M. Crawford was sentenced to 42 months in prison. Crawford pleaded guilty on July 26, 2006, to one count of income tax evasion. According to the plea agreement and testimony in court, Crawford was an employee of Pay Plus Payroll Administrators, Inc. Pay Plus collected funds from its corporate clients and agreed to file payroll tax returns (Forms 941) with the Internal Revenue Service and pay to the IRS its clients' payroll taxes. During the period between 1999 and 2003, Crawford engineered a scheme through which Pay Plus issued corporate checks to Crawford and other businesses and individuals associated with him, collected those funds, but did not turn them over to the IRS. As a result of Crawford's actions, the total of payroll funds embezzled and diverted between 1999 and 2003 was approximately $1,582,756.

On October 18, 2006, California Insurance Commissioner John Garamendi announced the arrests of four individuals accused of committing workers' compensation premium fraud which caused the loss of over $39 million. After a nearly four-year investigation conducted by the Department of Insurance's (CDI) Fraud

Division, investigators served arrest warrants against Luis Perez, Paul Rodas, Elizabeth Waldo, a/k/a Elizabeth Middleton and Oscar Hidalgo. An arrest warrant was still outstanding for Javier Chavolla. All of the suspects were either owners or principal employees of temporary employment agencies known as Checkmate Staffing Inc.; Checkmate Staffing West Inc.; Checkmate Staffing West Inc.; Checkmate Transport Inc; Tower Temps, Inc.; Staffaide Inc.; RPM Staff Leasing; and Tower Staffing Inc. Checkmate Staffing with headquarters in Orange, California, employed nearly 50,000 workers and had offices in 10 states. The company reported nearly a million dollars a day in sales, with annual revenues exceeding $100 million and an annual growth rate of 40 percent, Checkmate planned to open branch offices in all 50 states, as well as internationally. In 2003, Checkmate Staffing filed for bankruptcy protection after agreeing to settle with the State Compensation Insurance Fund for $7.2 million in unpaid workers' compensation premiums. Each of the four suspects was charged with one count of conspiracy to commit workers' compensation insurance fraud and one count of conspiracy to commit denial of workers' compensation insurance benefits. The suspects were all owners or employees who are alleged to have fraudulently underreported and/or misclassified employees to several insurance companies, including State Compensation Insurance Fund, Zurich American Insurance Company, and Redland Insurance Company. The suspects' companies were neither licensed insurers nor were they bonded and able to act as a third party administrator.

On September 26, 2006, Steven and Diane Christensen were sentenced in federal district court in Salt Lake City, Utah, to 37 months and 41 months in prison, respectively, for tax fraud. The Christensens operated employee leasing businesses in Midvale, Utah, including Paragon Business Solutions and Professional

Staffing Advantages. Prosecutors alleged that the Christensens defrauded First Utah Bank of nearly $13 million and that lives of other victims had been ruined by the Christensens. The Christensens lived a lavish lifestyle. They purchased a 10,000 square foot home, jewelry, boats and cars with the tax money they diverted. They also made significant contributions to The Church of Jesus Christ of Latter-day Saints which voluntarily returned the stolen money it received from the Christensens. Prosecutors alleged that the Christensens failed to pay their federal and employment taxes from 1995 to 1998. The Christensens were indicted in January, 2004, on charges of bank fraud, conspiracy and failure to file income tax returns. The indictment alleged they had defrauded First Utah Bank and neglected to pay federal income tax withholding on behalf of clients of their employee leasing companies. On August 9, 2006, a federal grand jury indicted them on charges of bank fraud, aggravated identity theft and committing a federal offense while on release for allegedly filling out a credit application in July, 2004, under someone else's name and submitting it to Wells Fargo Bank.

On September 22, 2006, a guilty plea by Thomas E. Brown was accepted in federal court in Jacksonville, Florida. Brown was a resident of Orange, California, who solicited business and collected premiums in connection with a nationwide fraudulent workers' compensation insurance scheme. Brown owned and operated MRIK Group, Inc., Fidelity Claims Management and FC Management. He sold fraudulent insurance using the names Regency Insurance of the West Indies, Ltd. and Transpacific International Insurance Company, Ltd. At least 11 major employee leasing companies purchased workers' compensation insurance from Brown's companies. Sentencing for Brown was scheduled for January 31, 2007. On January 10, 2007, a

Consent Motion was filed for forfeiture of a personal money judgment in the amount of $20,440,794.02.

On September 14, 2006, a federal court jury in Jacksonville, Florida, returned a guilty verdict on each of 23 counts of an indictment against Tom King for mail fraud, wire fraud and money laundering. The verdict came after the jury deliberated for one day after a three week trial. King was the president and majority owner of MiraLink Group, Inc., one of the largest employee leasing companies in Florida. In February, 2002, after CNA cancelled MiraLink's workers' compensation policy, King began using sham insurance from Regency Insurance of the West Indies, a non-existent insurance company allegedly created by Tom Brown and others while Brown was employed by Stat-Care in California. MiraLink continued to use the Regency insurance until the State of Florida issued a Stop Work Order to MiraLink in June, 2002. Even after the Stop Work Order, King moved his employees to another office and continued to operate his business. The government's witnesses included Tom Brown, who had pled guilty to mail fraud, wire fraud and money laundering; Mike McCafferty, the former head of TTC of Illinois, Inc., one of the largest employee leasing companies in the country, who also had pled guilty to fraud for using Regency Insurance; and many victim/employees who had been left with large medical bills because they had no insurance. Several of King's former employees also testified that he knew that Regency Insurance was not authorized to provide workers' compensation in Florida. Former employee Jerry Jacobs testified that the salespersons for MiraLink referred to the insurance amongst themselves as "Phantom Regency." In the months before his company was closed, King purchased a diamond engagement ring, a boat and a Hummer and went on a three-week vacation to the Bahamas. King's sentencing was scheduled for January, 2006.

On August 9, 2006, Brian Lambka and Edward Fisher were indicted in federal court in Detroit, Michigan and charged with tax fraud and bank fraud related to their former roles as officers of an employee leasing company, Simplified Employment Services, in Auburn Hills, Michigan. Lambka and Fisher were accused of being part of a plan to defraud the IRS out of $51 million from 1999 to 2001. Dennis Lambka, the brother of Brian Lambka, and the former CEO of Simplified, was previously sentenced to 54 months in the case. Ronald Bray, the former COO, was previously sentenced to 60 months. Fisher was accused of helping to write a deceptive statement that was intended to blame the company's tax problems on computer software and its junior accountants. Simplified claimed to be the largest privately held employee leasing company in the U.S., with 39,000 employees in 37 states. Simplified operated through several related companies including Design Administrative Resources Technologies, Employee Resource Management, Inc, Professional Employee Team Enterprises, Inc. and Elite Leasing, Inc.

On July 27, 2006, Robert Crawford pled guilty in federal court in Tampa, Florida, to one count of income tax evasion. The U. S. Attorney filed a criminal information charging Crawford with that offense on July 5, 2006. According to the facts in the plea agreement and testimony in court, Crawford was an employee of Pay Plus Payroll Administrators, Inc. which collected funds from its corporate clients and agreed to file payroll tax returns (Forms 941) with the Internal Revenue Service and pay to the IRS its clients' payroll taxes. During the period between 1999 and 2003, Crawford embezzled the funds of the company which he knew represented the payroll tax payments of Pay Plus' clients. He engineered a scheme through which Pay Plus issued corporate checks to Crawford and other businesses and individuals

associated with him, collected those funds, but did not turn them over to the IRS. During the tax year 2001, as a result of this scheme, he embezzled approximately $456,707.80 in funds from Pay Plus, an employee leasing company. The defendant's actions represented an attempt to evade the collection and payment of funds to the IRS. The total of payroll funds embezzled and diverted by the defendant between 1999 and 2003 was approximately $1,582,756.

On June 13, 2006, Steven E. Edwards was sentenced in Greensboro, North Carolina, to twelve and half years imprisonment, followed by three years supervised release. Edwards was also ordered to pay $4.4 million in restitution to his victims, to forfeit $3,897,470 as proceeds traceable to the scheme, and was fined $100,000. Edwards operated employee leasing companies including Magna Corporation, Integrity Corporation, and Nation's Group, from offices in Durham, North Carolina and Topeka, Kansas. The Edwards' companies operated in at least 20 states from 1998 through 2002. Thousands of employees of over 20 employee leasing companies were left without health care coverage and/or workers' compensation insurance which their employers purchased through Edwards' companies. The scheme came to an end after Liberty Mutual Insurance Company and Fireman's Fund Insurance Company denied coverage for employers who had been fraudulently added to their policies and filed fraud reports in over 20 states. In the height of the scheme, at least 20 large employee leasing companies in Florida, California, Illinois, Michigan, North Carolina, Oklahoma, South Carolina, Texas all claimed to be covered by policies procured through Edwards and his companies. The scheme was investigated and prosecuted by agents from the Department of Labor, the Internal Revenue Service and the Federal Bureau of Investigation, as well as

investigators from insurance fraud bureaus in Kansas, Florida, North Carolina and the South Carolina Workers' Compensation Commission, Compliance Division.

On April 18, 2006, Washington Insurance Commissioner Mike Kreidler filed a civil lawsuit seeking damages against three corporations and their principals. The lawsuit alleged that the defendants defrauded Cascade National Insurance Company and precipitated the company's financial failure. Cascade National was placed in receivership in 2004. Cascade National was domesticated in Washington and primarily wrote auto and commercial trucking insurance. In 2003, the company began providing workers' compensation insurance in California. The lawsuit alleged that Cascade was victimized in a deceptive purchase scheme involving companies and their principals operating in Texas, California, Kentucky and Florida. The named defendants were Midwest Merger Management, LLC of Kentucky; American Staff Resources of California; Certified Services; Danny L. Pixler; Roxann Pixler; Anthony Huff; and Sheri Huff.

On March 24, 2006, an Opinion was issued in the case of Reliance Insurance Company v. Safeharbor Employer Services I, Inc., f/k/a BNA Group II, Inc. and Professional Staffing - A.B.T.S., Inc. (2006 WL 822527), upholding the right of Reliance (in liquidation) to collect a retrospective premium on workers' compensation insurance policies issued to Defendants Safeharbor Employer Services I, Inc. ("Safeharbor") and Professional Staffing-A.B.T.S., Inc. ("Professional Staffing"). The case was tried before the Court without a jury on February 1st and 2nd, 2006. Reliance was a Pennsylvania corporation, and formerly one of the largest providers of workers' compensation insurance in the United States. On October 3, 2001, Reliance was placed in liquidation by the state of Pennsylvania. The state's insurance

commissioner was charged with the responsibility of winding up Reliance's affairs, including collection of the premiums at issue in this lawsuit. Defendants provide employee leasing and professional staffing services. From December 1, 1997 through December 1, 1999, the Defendants were covered by workers' compensation insurance policies issued by Reliance which carried a large deductible and were collateralized by two letters of credit totaling nearly $1.4 million. The resulting retrospective premium ($3,356,225) was well in excess of the maximum allowed under the policy. The Plaintiff sought payment of $907,801, representing the difference between the agreed maximum premium ($2,700,000) and the amount prepaid by the Defendants, ($1,792,599), plus the $400 audited non-subject premium. The Court concluded that the defendants breached the contract of insurance by failing to pay the retrospective premium of $907,801. Judgment was entered against Safeharbor Employer Services, I, Inc. in the amount of $758,226. Judgment was entered against Professional Staffing-A.B.T.S., Inc., in the amount of $149,575.

On February 22, 2006, Justin Bruner and Paul W. Voyles, Jr. were indicted in federal court in Oklahoma City, Oklahoma. Bruner was president of Fairway Employment Services and a 40% owner. Voyles owned 20% of Fairway. Prosecutors charged that between November, 2000, and January, 2001, Bruner and Voyles attempted to get workers' compensation for the clients of Fairway through National Benefits Alliance, and an affiliate, Freedom Services, employee leasing companies in Oklahoma City, Oklahoma. Great American Insurance Company, the carrier for National Benefits Alliance, refused to add ("piggyback") Fairway to the National Benefits policy. The indictment alleged that despite having no workers' compensation, Bruner and Voyles continued to collect fees for workers' compensation from their

clients. The indictment also alleged that the defendants made material false statements to the IRS on their quarterly 941 reports during this period showing far less payroll than the actual payroll of Fairway Employment Services.

**Major Issues Involving PEOs and Workers' Compensation**

These cases illustrate that there are three major areas where regulation of employee leasing companies needs to be strengthened:

**1. UNINSURED INJURED WORKERS**

**How can PEOs be best regulated to ensure that employees of PEOs are covered by valid workers' compensation insurance policies?**

The majority of states regulate employee leasing to some extent, and other states are considering such legislation. No states, however, now require that an employee leasing company disclose to the public any information regarding its workers' compensation insurance, even though such coverage is a major reason many employers use the services of an employee leasing company. Only 12 states give the public access to information regarding proof of all employers' workers' compensation coverage.

Almost every employee leasing company has a website. States could require that every employee leasing company include information on its website including the name of its workers' compensation carrier, its policy number, the effective date of coverage, and any changes in carriers, cancellations, non-

renewals, or lapses in coverage in the prior three years. Any such statute could also declare that making false statements regarding such coverage would be a criminal act.

In addition to disclosure, there is a problem of identification of an employee leasing company/policyholder. How many employee leasing companies can be covered under a single workers' compensation policy? In the past few years, the debate regarding coverage has been focused on whether an employee leasing company should be written using a "Master Policy" or "Multiple Coordinated Policies." Many of the criminal cases, however, have involved multiple employee leasing companies claiming to be covered under the same single workers' compensation policy. In many of these cases, several employee leasing companies have claimed to be client companies of another employee leasing company. States could require that every employee leasing company, regardless of common ownership, have its own, separate and distinct workers' compensation policy.

## 2. PREMIUM FRAUD

**How can PEOs be best regulated to ensure that workers' compensation insurance companies receive fair and adequate premium?**

Many workers' compensation insurance companies have had very costly experience with employee leasing companies. The losses are often compounded when the policy is followed by prolonged litigation. When insurance companies lose money, the loss is often passed on to the public in the form of rate increases, so the private company loss becomes a public problem.

The largest losses occur when the exposure – or payroll – covered by a particular policy suddenly increases by hundreds of thousands of dollars in a particular quarter. This can happen when the employee leasing company adds any large employer to its client list without pre-approval from the insurance company. One approach is to add an endorsement to the policy that any payroll increase of greater than 10% requires prior approval – and pre-payment of premium.

Such restrictions are often ignored, however, resulting in yet one more civil action for breach of contract. Another approach would be to limit the payroll on any policy issued to an employee leasing company. According to NAPEO, the average client of NAPEO's member PEOs is a small business with 17 worksite employees. Insurance companies – or states - could allow employee leasing companies to add clients with 20 or fewer employees, but to require all other new clients to be covered under their own individual policies.

Insurance companies must all be required to conduct physical audits of employee leasing companies which are supported and reconciled to state and federal tax returns.

Several large workers' compensation insurance companies have

failed to submit data to the rating organizations as required, when required. This has been a particular problem with policies issued to large employee leasing companies. When carriers repeatedly fail to meet their data reporting obligations regarding policies issued to employee leasing companies, the authority of such carriers to issue policies to employee leasing companies could be suspended or revoked.

The majority of policies issued to employee leasing companies in recent years have been large deductible policies. These policies are usually serviced through third-party administrators. The selection of the third-party administrator is often a critical part of the negotiation between the carrier and the employee leasing company. In many instances, carriers have allowed employee leasing companies to use third party administrators which are owned or controlled by the leasing company itself. This has at times resulted in problems of significant under-reserving and non-reporting of claims. Prohibitions against "self-servicing" of claims could be enacted, similar to Medicare restrictions on physicians which prohibit "self-referrals" to clinics or therapy centers where the physicians has a financial interest.

### 3. TAX EVASION

**How can PEOs be best regulated to ensure that PEOs and their client companies pay all required federal and state**

**employment taxes?**

The most significant problem involving employee leasing companies and tax evasion is that a small, but significant number of employee leasing companies have not submitted tax payments to the IRS after collecting taxes from client companies. This problem was addressed on March 14, 2006, in the written testimony of IRS Commissioner Mark Everson before the Senate Committee on Homeland Security and Governmental Affairs Permanent Subcommittee on Investigations Hearing on Federal Contractors Who Cheat on Their Taxes.

According to Eversen, employee leasing companies typically, these firms prepare and file employment tax returns for their clients using the leasing company's name and employer identification number, often taking the position that the leasing company is the statutory or common law employer of the clients' workers. Under present law, there is uncertainty as to whether the employee leasing company or its client is liable for unpaid federal employment taxes arising with respect to wages paid to the client's workers. Thus, when an employee leasing company files employment tax returns using its own name and employer identification number, but fails to pay some or all of the taxes due, or when no returns are filed with respect to the wages paid by a company that uses an employee leasing company, there can be uncertainty as to how the federal employment taxes should be assessed and collected.

The Bush Administration proposed legislation in May, 2006, that would set forth standards for holding employee leasing companies jointly and severally liable with their clients for federal employment taxes. The proposal, The Grassley-Baucus Small Business Efficiency Act, would also provide standards for holding

employee leasing companies solely liable if they met certain specified standards. According to its sponsors, The Grassley-Baucus Small Business Efficiency Act would improve small businesses' efficiency by eliminating any uncertainty about the ability of qualifying PEOs to assume liability for paying wages and collecting and remitting federal employment taxes. Grassley and Baucus said the Small Business Efficiency Act would permit PEOs certified by the IRS to collect and remit the federal employment taxes of their business clients' employees. The certification process would be voluntary and was designed with significant input from all stakeholders, including the Department of the Treasury and the IRS. To be certified by the IRS, the organization would have to meet financial and other standards and maintain ongoing certification by the IRS. The certified organization would be required to assume full and sole responsibility for the collection of federal employment taxes.

The problem with the employee leasing company having sole responsibility for taxes is primarily a collection problem. Employee leasing companies seldom have physical assets – such as a manufacturing plant or a fleet of vehicles – which can be attached to satisfy a tax obligation. Moreover, relieving the client companies of the responsibility of seeing that their taxes are paid is likely to encourage client companies to sign on with the leasing company which offers the lowest rates – regardless of whether such low rates have been achieved through fraud.

Why do small businesses trust employee leasing companies to pay their taxes? In most cases, such tax responsibility is part of the standard employee leasing contract. In order to get the benefits of an employee leasing company – usually, reduced

workers' compensation premium – the small businesses must agree to accept the other services "offered" by the employee leasing company. There are too many examples, however, of employee leasing companies that have used low workers' compensation rates to attract businesses, and have diverted the tax payments of such businesses, easily diverting hundreds of thousands of tax dollars.

In addition to federal employment taxes, more states in 2006 identified problems with employee leasing companies and "SUTA dumping." For state unemployment tax (SUTA) liability, employee leasing companies may contract with clients that have higher SUTA rates. The employee leasing companies then pay taxes at their SUTA rate and charge a higher rate to the client. The difference in these rates is profit for the leasing company. SUTA arbitrage, commonly referred to as "SUTA dumping," has been prohibited by most states. In 2004, President George W. Bush signed into law the SUTA Dumping Protection Act of 2004. This law requires that all 50 states enact anti-SUTA-dumping legislation by 2007.

States could require that every employee leasing company disclose its SUTA rate quarterly as part of a licensing process and certify that clients are not charged a higher rate.

CONCLUSION

With 700 employee leasing firms and $51 billion dollars in gross revenues, the need for regulation of employee leasing company

practices has never been greater. Four employee leasing companies now claim to each have over $2 billion in annual payroll. Employee leasing companies have a great deal of power over health plans, workers' compensation insurance, taxes and the rights of organized labor and a poor track record. In 2007, effective regulation of employee leasing companies must be a top priority.