ORDERED in the Southern District of Florida on 07/16/08



Raymond B. Ray, Judge
United States Bankruptcy Court

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF FLORIDA
(FORT LAUDERDALE DIVISION)

| | |
|---|---|
| In re<br><br>CERTIFIED HR SERVICES COMPANY<br>f/k/a THE CURA GROUP, INC.,<br><br>    Debtor.<br>_____/ | CASE NO. 05-22912-BKC-RBR<br>CHAPTER 11 |
| JAMES S. FELTMAN, Chapter 11<br>Trustee of CERTIFIED HR SERVICES<br>COMPANY f/k/a THE CURA GROUP,<br>INC. AND CERTIFIED SERVICES, INC.,<br><br>    Plaintiff,<br>vs.<br><br>LEADING EDGE GROUP HOLDINGS, INC.<br>And JOHN OR JANE DOES (1-10),<br><br>    Defendant.<br>_____/ | ADV. NO. 07-01316-BKC-RBR |

**MEMORANDUM DECISION GRANTING TRUSTEE'S MOTION TO COMPEL
DISCOVERY BASED UPON CRIME-FRAUD EXCEPTION TO THE
ATTORNEY-CLIENT PRIVILEGE AND WORK PRODUCT DOCTRINE(C.P. # 95)**

1

THIS CAUSE came before the Court on May 21, 2008, at 9:30 a.m. on the *Plaintiff's Motion to Compel Discovery based upon Crime-Fraud Exception to the Attorney-Client Privilege and Work Product Doctrine and for Other Relief* (C.P. #95) (hereinafter "Motion to Compel Discovery"). The Court has reviewed and considered the Motion to Compel Discovery, the *Defendant's Opposition to Plaintiff's Motion to Compel Discovery based upon Crime-Fraud Exception to the Attorney-Client Privilege and Work Product Doctrine and for Other Relief* (C.P. #109) (hereinafter "Opposition to Motion to Compel Discovery"), and having heard arguments at the May 21, 2008 hearing, hereby enters this memorandum decision granting the Trustee's Motion to Compel Discovery.

## BACKGROUND:

In this action, the Trustee seeks to avoid certain transfers to the Defendant as being fraudulent transfers received from Cura and CSI totaling in excess of $1.9 million. By his Motion to Compel Discovery, the Trustee is seeking to compel the Defendant and its respective pre-petition counsel including, but not limited to, attorney Mark Robinson and the law firm of Michelman & Robinson (the "M&R Law"), to disclose the details and substance of *all* communications, documents and accompanying work product relating to transfers, transactions, negotiations and dealings that are the subject matter of this fraudulent transfer action, and which all occurred during the four years prior to Cura filing its bankruptcy petition in 2005.

At depositions conducted on April 16-18, 2008 in California, Illinois and New Jersey, the deponents, who consisted of: (i) Allen Hilly ("Hilly"), the chairman and CEO of Leading Edge; (ii) Michael Ward, the president/owner of JRSO; and (iii) pre-petition date counsel Leading Edge and JRSO, attorney, Mark Robinson ("Robinson").

2

Each of the foregoing witnesses failed and refused to answer questions involving the legal facts and circumstances involving a certain non-authorized worker's compensation insurance program provided by Leading Edge to Cura under a purported "term sheet", which program was created, operated, designed and/or implemented by Leading Edge and JRSO, with the active advice and counsel of Robinson and the M&R Law Firm. [D.E. 95 ex 1]. However, the "term sheet" governing the rights of the parties, the purported "insurance program" offered by Leading Edge was not authorized to operate in any state in which it had been implemented and operated by Cura.

Throughout the depositions taken during April 16-18, 2008, the witnesses repeatedly asserted that all communications between and among themselves and their counsel relating to the Term Sheet and the resulting transfers and transactions at issue are protected by the attorney-client privilege or the work product doctrine. The Trustee argues that granting his Motion to Compel Discovery at this stage of the proceedings will allow: (i) the discovery process to be streamlined and completed in a timely manner; (ii) for the reduction or elimination of duplicative depositions; and (iii) for this adversary proceeding to proceed expeditiously to trial.

The Court also notes that all of Leading Edge's business records have been confiscated by the US government as part of a 2007 $10 million PEO-related wire fraud indictment of Hilly, who is alleged in the criminal action to be the "alter ego" of Leading Edge.

I. Debtor's Pre-Petition Business

Prior to the petition date and for a short period of time thereafter, Cura was a Florida corporation that operated as a Professional Employer Organization ("PEO") that provided off-site human resources functions such as payroll administration, employment taxes, benefits, workers compensation and governmental compliance services to various companies. A PEO

generally provides services to its clients and its clients' employees, whereby the PEO becomes a co-employer of the clients' worksite employees. Under this arrangement, employment-related liabilities are contractually allocated between the PEO and the client. Among other responsibilities, the PEO assumes responsibility for and manages the risks associated with workers compensation insurance for worksite employees. As a PEO, Cura maintained workers compensation coverage for employees in all states in which it had employees. A failure by Cura to provide workers compensation coverage could have resulted in severe penalties from state governmental authorities.

II. The Transfers at Issue

Between May, 2001 and May, 2006, CSI and the Debtor transferred in excess of $108 million to Midwest (collectively, the "Midwest Transfers"). The funds transferred by Midwest to Brentwood came from the Midwest Transfers received from the Debtor and CSI. The Midwest Transfers consisted of the majority, if not all, of the monies generated by CSI and the Debtor in the course of their operations.

In this action, the Trustee alleges that Midwest did not exercise dominion and control over the funds constituting the Midwest Transfers received from CSI and the Debtor and as such acted as conduits for the further transfer of such funds by CSI and the Debtor to others, including the Defendant. Alternatively, the Trustee alleges that Midwest exercised dominion and control over the funds constituting the Midwest Transfers received from the Debtor and/or CSI, determining which third parties, if any, were to be paid and how much they were to be paid.

From the funds constituting the Midwest Transfers, Midwest effectuated transfers to various third parties, including the Defendant, for which neither CSI, the Debtor, nor Midwest,

as applicable, received value.  Specifically, Leading Edge is alleged to have received the following transfers:

| Check/<br>Wire Date | Check Number | Payor | Global Payee | Amount |
|---|---|---|---|---|
| 09/16/03 | WIRE | Midwest | Leading Edge Group Holdings<br>(through Michelman & Robinson) | $ 600,000.00 |
| 09/23/03 | WIRE | Midwest | Leading Edge Group Holdings | $ 300,000.00 |
| 10/07/03 | WIRE | Midwest | Leading Edge Group Holdings | $ 343,265.00 |
| 10/24/03 | WIRE | Midwest | Leading Edge Group Holdings | $ 383,000.00 |
| 12/30/03 | 3177 | Midwest | Leading Edge Group Holdings | $ 277,404.0 |
|  |  |  |  | $ 1,903,669.00 |

### FINDINGS OF FACT/CONCLUSIONS OF LAW:

The findings and conclusions set forth herein constitute the Court's findings of fact and conclusions of law pursuant to Bankruptcy Rule 7052, made applicable to this proceeding pursuant to Bankruptcy rule 9014. To the extent any of the following findings of fact constitute conclusions of law, they are adopted as such.  To the extend any of the following conclusions of law constitute findings of fact, they are adopted as such.

### The Attorney-Client Privilege

This is a federal question case involving federal bankruptcy law (i.e., objection to exemption claims under Fed. R. Bank. P. 4003(b) and 11 U.S.C. § 522 and fraudulent transfers claims under 11 U.S.C. § 544(b)), thus privilege issues are governed by the federal common law. *SEC v. Dowdell*, 2006 U.S. Dist. LEXIS 31803, at *9 (M.D. Fla. May 15, 2006).

The attorney-client privilege is one of the oldest privileges recognized in common law. *Swidler & Berlin v. United States*, 524 U.S. 399, 403 (1998). The privilege is intended to facilitate "full and frank communication between attorneys and their clients and thereby promote broader public interests in the observance of law and the administration of justice."*Swidler &*

*Berlin*, 524 U.S. at 403 (quoting *Upjohn Co. v. United States*, 449 U.S. 383, 389 (1981)). The privilege is not absolute and there are certain communications which fall outside of its protective embrace. *Swidler & Berlin*, 524 U.S. at 414 (recognizing that there are a number of exceptions to the privilege)(J. O'Conner dissent);*United States v. Leventhal*, 961 F.2d 936, 940 (11th Cir. 1992)(noting that the "identity of a client or matters involving the receipt of fees from a client are not normally within the attorney-client privilege").

Under the "crime-fraud" exception the attorney client privilege does not extend to communications made for the purpose of furthering a crime or fraud. *United States v. Zolin*, 491 U.S.554, 563 (1989); *United States v. Cleckler*, 265 Fed. Appx. 850, 853 (11th Cir. 2008). To determine the applicability of the crime-fraud exception a two part test is employed. First, there must be a prima facie showing that the client was engaged in criminal or fraudulent conduct when he sought the advice of counsel, that he was planning such conduct when he sought the advice of counsel, or that he committed a crime or fraud subsequent to receiving the benefit of counsel's advice. Second, there must be a showing that the attorney's assistance was obtained in furtherance of the criminal or fraudulent activity or was closely related to it. *United States v. Cleckler*, 265 Fed. Appx. at 853; *Cox v. Adm'r U.S. Steele & Carnegie*, 17 F.3d 1386, 1416 (11th Cir. 1994).

The crime fraud exception has been applied by bankruptcy courts to cases involving fraudulent transfers. *Talenfield v. Siervo (In re Siervo)*, 2006 Bankr. LEXIS 2776, at *6-7 (Bankr. S.D. Fla. April 3, 2006)(finding that the Trustee failed to meet her burden under the two pronged test); *In re Campbell*, 248 B.R. 435, 440 (Bankr. M.D. Fla. 2000)(determining that there was an sufficient inference that certain transfers may have been fraudulent and thus the crime-fraud exception was applicable). In those cases the courts have used the "badges of fraud"

standard to determine whether the moving party has met its burden to make a prima facie showing that the client was engaged in criminal or fraudulent conduct. *Talenfield* at *7. These badges include:

(1) The transfer was to an insider;

(2) The debtor retained possession or control of the property transferred after the transfer;

(3) The transfer was disclosed or concealed;

(4) Before the transfer was made the debtor had been sued or threatened with suit;

(5) The transfer was of substantially all of the debtor's assets;

(6) The debtor absconded;

(7) The debtor removed or concealed assets;

(8) The value of the consideration received by the debtor was not reasonably equivalent to the value of the asset transferred;

(9) The debtor was insolvent or became insolvent shortly after the transfer was made;

(10) The transfer occurred shortly before or shortly after a substantial debt was incurred; and

(11) The debtor transferred the essential assets of the business to a lienor who transferred the assets to an insider of the debtor.

*Dionne v. Keating (In re XYZ Options, Inc.)*, 154 F.3d 1262, 1271 (11th Cir. 1998).

Applying the badges of fraud to the record evidence of the instant adversary proceeding establishes a prima facie case that the transfers at issue were done with actual intent to hinder, delay or defraud Debtor's creditors because four of the twelve badges exist:

First, the transfers were to an insider; the initial transfers were made to Midwest, Cura's controlling shareholder, which then transferred the funds to the Defendant. Second, before the transfers were made the Debtor had been sued or threatened with suit; as several material lawsuits were pending against Cura at or around the time of the transfers at issue. Third, the transfers were of substantially all of the Debtor's assets. The Midwest Transfers comprised substantially all of the Debtor's assets. Fourth, the Debtor was not paying its normal and ordinary debts as they became due when the fraudulent transfers occurred. This is evidenced by the fact that significant liabilities went unpaid at or around the time of each of the Midwest Transfers, and at the time of the transfers to the Defendant at issue.

Even more troubling in this case is the "term sheet" which formed the basis of the relationship between the Defendants and the Debtor. The Term Sheet provided as follows:

> PLEASE BE ADVISED THAT THE SECURITIZER [as defined in the Term Sheet] IS NOT LICENSED BY ANY GOVERNING BODY AS AN INSURANCE OR REINSURANCE COMPANY. THE SECURITIZATION PROGRAM IS NEITHER INTENDED NOR IS QUALIFIED UNDER ANY JURISDICTION AS AN ACCEPTABLE OR AS AN ALTERNATIVE TO ANY COMPULSORY INSURANCE IN ANY STATE IN THE USA, AND HAS NOT BEEN APPROVED BY ANY GOVERNMENTAL AGENCY AS A VIABLE VEHICLE TO PROVIDE STATE REQUIRED WORKERS' COMPENSATION INSURANCE. ALL PARTIES RECOGNIZE THAT THE TERM WORKERS' COMPENSATION HAS SPECIFIC MEANING AND INTENT AS ADOPTED BY ALL JURISDICTION OF THE USA, AND AS SUCH THE ASSOCIATED PROGRAM MAY ONLY BE ENTITLED AS AN "EMPLOYERS OCCUPATIONAL MEDICAL AND INDEMNITY PROGRAM". CURA and SECURITIZER (as hereinafter defined) collectively believe that the provisions of the Employers Occupational Medical and Indemnity Program set forth below are an acceptable alternative vehicle to traditional workers' compensation coverage as either afforded by an admitted and properly certified insurance company, or a State sponsored pool. Should any State authority issue a final determination, after due consideration of the arguments proffered by CURA and/or LEADING EDGE HOLDINGS, CURA shall have the option to replace the Employers' Occupational Medical and Indemnity Program in that State with an alternative program or LEADING EDGE HOLDINGS shall have the option of terminating the

> Employers' Occupational Medical and Indemnity Program in that State or in all States.
>
> * * *
>
> LEADING EDGE HOLDINGS via a Special Purpose Reinsurer ("SPR"), collectively hereinafter referred to as "SECURITIZER" shall provide SECURITIZATION to CURA and its specific customers effective June 30, 2003 and continuing through June 29, 2004, hereinafter referred to as the "INITIAL ANNUAL PERIOD," renewable minimum of SIXTY (60) days in advance of each subsequent annual period, but exclusively at the discretion of the SECURITIZER. The SPR shall fully SECURITIZE the Employers Occupational Medical and Indemnity Program to include such claims, losses, and liability of CURA's and the specifically recognized and identified CURA clients, but specifically excluding all operations within the States of Arizona, Florida and Nevada. As described herein, the nature of the transaction necessitates the introduction of an offshore SPR for the sole purpose of facilitating the process, and as such CURA and its clients are required in remitting the requisite Federal Excise Tax ("FET") presently calculated at three percent (3%) of the prepaid paid-in-capital, subject to a monthly audit in determining the actual accrued/assumed paid-in-capital. Typically, SECURITIZATION includes and/or involves top line related fees, expenses and loading variables payable to SECURITIZER in advance and at future intervals as a percentage of the cost of such transaction. In this relationship, SECURITIZER hereby entirely waives all such SECURITIZAT1ON top line driven income in exchange for complete ownership of the accrued paid-in-capital, and as such, completely and exclusively realizes or inherits, respectively, the upside or downside potential associated with SECURITIZING the transaction as described herein.

Term Sheet at pp. 1-2.

While there is still much evidence and testimony surrounding the term sheet and the relationship between the parties that needs to be brought before the Court. A plain and simple reading of the language of the term sheet raises several red flags. In the opinion of this Court, the term sheet itself is *prima facie* evidence that the parties have been engaged in fraudulent conduct. Furthermore, the Court notes that the term sheet was signed by the Debtor on September 16, 2003. Which, interestingly, is the same day that Midwest wired $600,000.00 to the Defendants. Thus the term sheet, based on the facts currently before the Court, is clearly

linked to the transfers that the Trustee is seeking to recover. These facts coupled with the above badges of fraud analysis constitute a prima facie showing of a potential fraud. As such the first part of the two prong test is met.

The second prong of the two part test is met if the Trustee can show that the attorney's assistance was used to further the fraud or was closely related to it. The term sheet provides the most striking evidence under this prong. The law firm of Michelman & Robinson was listed as a party to receive notice of termination. Based on this fact alone, it is clear that Michelman & Robinson were aware of the term sheet and represented one of the parties to it. Since the term sheet on its face appears to document a fraud, there is sufficient basis to conclude that the legal efforts of the law firm of Michelman & Robinson are connected or closely related to the term sheet. Thus, the Court is satisfied that a *prima facie* showing has been made connecting the law firm of Michelman & Robinson with the alleged fraud.

Accordingly, based on the foregoing the Court is satisfied that the two prong test has been met. Therefore, the Court will grant the motion to the extent it seeks discovery based on the crime fraud exception.

The Trustee has also sought discovery that would otherwise be protected by FED. R. CIV. P. 26(b)(3), also known as the "work product doctrine". The work product rule applies to items prepared in anticipation of litigation by a party's attorney. *In re Alexander Grant & Co. Litigation,* 110 F.R.D. 545, 548 (S.D. Fla. 1986) "[U]pon a proper showing that [items] were prepared ... in anticipation of litigation ... [a party] may invoke the work product privilege." *Id.*; *Duplan Corp. v. Moulinage et Retorderie de Chavanoz,* 509 F.2d 730 (4th Cir. 1974); *In re Grand Jury Proceedings, Thursday Special Grand Jury Sept. Term, 1991,* 33 F.3d 342, 348 (4th Cir. 1994). The crime fraud exception applies to the work product doctrine. *In re EEOC,* 207

Fed. Appx. 426, 433 (5th Cir. 2006); *Gutter v. E.I. DuPont de Nemours & Co.*, 1998 U.S. Dist. LEXIS 23209, at * 3 (S.D. Fla. January 13, 1998)(applying the two pronged test for the crime fraud exception to both the attorney client privilege and the work product doctrine). The Court does note that the indictment of some of the Defendant's principals has led to the confiscation of most if not all of the relevant documents by the Federal Authorities. These documents are for all intents and purposes unavailable to the Trustee to prosecute this adversary. Thus, to the extent any exception to the work product doctrine requires a finding that the documents be unavailable for production in discovery, the Court so finds.

Since the Court has already found that the crime fraud exception applies in this case for the attorney client privilege, it necessarily also applies on the same facts to work product that is closely related to the term sheet and the alleged transfers. Accordingly, to the extent the Trustee sought relief from the work product privilege, it will be granted.

Accordingly, it is **ORDERED** as follows:

The Trustee's Motion to Compel Discovery is granted. The Defendants shall, within ten (10) business days of the date of this Memorandum Decision, disclose all documents and communications between and among the Defendants and their counsel relating to the transfers listed above and the term sheet attached to the complaint.

# # #

Copy to:
David C. Cimo, Esq.
Jacob A Armpriester, Jr
Stephen V. Falanga